```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   4 PILLAR DYNASTY LLC and
     REFLEX PERFORMANCE RESOURCES
 4   INC.,

 5                  Plaintiffs,

 6            v.                                16 CV 2823 (JSR)

 7   NEW YORK & COMPANY, INC. and
     NEW YORK & COMPANY STORES,
 8   INC.,

 9                  Defendants.

10   ------------------------------x
                                           New York, N.Y.
11                                         February 6, 2017
                                           9:45 a.m.
12   Before:

13                       HON. JED S. RAKOFF,

14                                         District Judge
                                              And A Jury
15
                             APPEARANCES
16
     OVED & OVED LLP
17        Attorneys for Plaintiffs
     BY:  DARREN OVED
18        AARON JASON SOLOMON
          JEREMY WEINSTEIN
19
     O'REILLY IP PLLC
20        Attorneys for Defendants
     BY:  BRIAN D. O'REILLY
21        -AND-
     GABRIEL & PELAEZ PLLC
22   BY:  MICHAEL GEORGE GABRIEL

23   ALSO PRESENT:

24   BEHROOZ HEDVAT
     ADAM RATNER
25   JULIE ZERBO, Defense Paralegal
```

1        (Case called)

2        THE DEPUTY CLERK:  Will everyone please be seated and

3    will the parties please identify themselves for the record.

4        MR. SOLOMON:  Good morning, your Honor.  Aaron

5    Solomon, from Oved & Oved LLP, on behalf of the plaintiffs.  I

6    have with me today also:

7        MR. OVED:  Good morning, your Honor.  Darren Oved,

8    from Oved & Oved LLP, on behalf of the plaintiffs as well.  And

9    with me is:

10        MR. WEINSTEIN:  Jeremy Weinstein, from Oved & Oved.

11        MR. OVED:  Seated to our right is principal of

12    plaintiffs, Mr. Behrooz Hedvat.

13        MR. O'REILLY:  Good morning, your Honor.  Brian

14    O'Reilly from O'Reilly IP, representing the defendant

15    New York & Company.

16        MR. GABRIEL:  Michael Gabriel -- good morning, your

17    Honor -- from Gabriel & Palaez, for the defendant.

18        MR. O'REILLY:  Your Honor, Adam Ratner, from the

19    client, will be joining us as well but he has stepped out right

20    now.

21        THE COURT:  All right.  Good morning.

22        Thank you for your pretrial consent order.  Everything

23    seems in order.

24        We will pick a jury of eight and each side will have

25    three peremptory challenges.  We do this in rounds, so my

1   courtroom deputy will hand the board to plaintiffs' counsel,

2   you'll turn over the card of the person you're striking on that

3   round but then you'll turn the board over to your adversary,

4   he'll strike whoever he's going to strike on that round, we'll

5   then replace those two, and so forth, for the three rounds.

6          If you waive your challenge on a given round but your

7   adversary does not, then we continue and you've lost that one

8   challenge but you still have your remaining challenges, but if

9   both sides waive on a round, then we have the jury.

10          So, any questions about that?

11          MR. O'REILLY:  No, your Honor.

12          THE COURT:  Okay.  How long does plaintiffs' counsel

13   want for an opening statement?

14          MR. SOLOMON:  Your Honor, I anticipate our opening

15   statement to be approximately ten, fifteen minutes.

16          THE COURT:  Okay.  And defense counsel?

17          MR. O'REILLY:  Approximately 20 to 25 minutes, your

18   Honor.

19          THE COURT:  Okay.  25 minutes would be about the most

20   I would expect in a case like this, so make sure you don't go

21   further than that.

22          There were no motions in limine.  There were, however,

23   some objections to certain exhibits on the ground that they

24   were produced in an untimely fashion.  Rather than deal with

25   that now, if and when those documents are about to be

 1    introduced, come to the sidebar and we'll deal with that issue

 2    when it comes up.  I don't think we need to take the time now.

 3         Now, the jury panel will be ready -- Linda, do you

 4    have any idea?

 5         THE DEPUTY CLERK:  Yes.  10:30.

 6         THE COURT:  -- 10:30.  And we'll take a break at

 7    10:00 because I have a short conference call and then we'll

 8    come back at 10:30 and pick the jury.

 9         So, anything else we need to take up now?

10         MR. SOLOMON:  Your Honor, if I may?

11         THE COURT:  Yes.

12         Oh, I'm sorry, one thing I forgot.  Except one

13    representative of each party at the counsel table, all other

14    witnesses are excluded from the courtroom, so make sure as you

15    call your witnesses, that they remain in the witness room till

16    they're called.

17         Yes.

18         MR. SOLOMON:  Your Honor, if I may, we have three

19    brief issues to discuss.  Your Honor just mentioned one of

20    them, which is the concern about additional documents that were

21    produced by defendants after the close of discovery but also

22    after the deadline for motions in limine to be submitted.

23    We're fine to deal with that later, when the exhibits will be

24    introduced, your Honor.

25         THE COURT:  My experience is that lots of exhibits

1    that are on the witness list don't get even offered and

2    therefore why not deal with it until --

3         MR. SOLOMON:  That's true, your Honor, but I see them

4    in the courtroom, so I anticipate them using them.

5         THE COURT:  I see.  All right.

6         MR. SOLOMON:  What it is, your Honor, our discovery

7    demands were served in May 2016.  We specifically called for

8    all documents that were going to be used at trial.  We

9    specifically called for all documents that support defendant's

10   defense that other people, other entities, use the word

11   "velocity" in garments.

12        We got USPTO printouts and a couple of products, Web

13   pages from products.  They have updated their USPTO printouts,

14   which is fine -- I would actually object if they didn't update

15   the USPTO printouts because it's a publicly filed documents and

16   the most recent version should be admitted -- but what they've

17   done is, they recently retained new counsel and now have

18   approximately 100 pieces of evidence, be them garments or the

19   supporting documentation to show that they purchased the

20   garments and shipped the garments, that were all done in

21   January 2017.  There is no reason why this couldn't have been

22   done before the discovery cutoff in October 2016 or anytime

23   before the motions in limine had to be filed, which was in

24   January 16, 2017.

25        THE COURT:  When were these produced?

1          MR. O'REILLY:  Your Honor, I can address it very

2     quickly.

3          THE COURT:  Yes.

4          MR. O'REILLY:  These are third-party uses that we

5     collected just recently.  They're third-party uses of the word

6     at issue here.  And the plaintiff in this case has alleged that

7     they policed their mark, and we didn't have these during

8     discovery so we couldn't produce them.  It's very common to

9     collect third-party uses after the close of discovery and prior

10    to trial.

11         THE COURT:  I don't know about that and I don't know

12    the relevance of that.  The question is, I think, one of

13    prejudice.  For example, if you were to produce some exhibit to

14    your adversary the day before you introduced it at trial, to

15    take the extreme case, you could tell me it's as common as

16    chopped liver, it wouldn't matter, it would still be

17    prejudicial.

18         MR. O'REILLY:  No, we had produced these to counsel

19    when we exchanged our exhibits.  We exchanged the hard copy of

20    our exhibits and we got theirs.  They had ones that they didn't

21    show up before --

22         THE COURT:  Just so I'm clear, when did you obtain

23    these exhibits?

24         MR. O'REILLY:  Days before we produced them, maybe a

25    week before we produced them.

1          THE COURT:  And tell me what they consist of again.

2          MR. O'REILLY:  Your Honor, they're basically Internet

3     printouts of third parties using the mark in question in this

4     case in a manner that plaintiff alleges infringes their mark.

5     And under Second Circuit case law, when many --

6          THE COURT:  How are you planning to introduce them?

7          MR. O'REILLY:  We want to use them on

8     cross-examination, your Honor, to question the witness about

9     his policing of his mark, because his position is that he

10    searched the Internet --

11         THE COURT:  So if you say to a witness, wasn't there

12    such-and-such on the Web and he says, in my hypothetical, I

13    have no idea, how do you get it then into evidence?

14         MR. O'REILLY:  I would say, have you seen this Web

15    page before?

16         THE COURT:  And suppose the answer is no.

17         MR. O'REILLY:  Then do you believe -- well, there's no

18    argument to authentication here.  The plaintiff has not

19    objected --

20         THE COURT:  No, no, I'm not talking about

21    authentication.  I'm talking about the if the witness says, no,

22    I've never seen it.

23         MR. O'REILLY:  That's fine.  I'm not using it to

24    impeach.  I'm using it as a cross document to show --

25         THE COURT:  Well, what do you then do with that?  Do

 1    you offer it?

 2            MR. O'REILLY:  Yes, your Honor.

 3            THE COURT:  Are you saying it's both

 4    self-authenticating and otherwise admissible on its face?

 5            MR. O'REILLY:  I think the authentication issue is

 6    separate than the admissibility in terms of evidentiary

 7    admissibility.  Authentication, there's no argument --

 8            THE COURT:  Whoa, whoa, excuse me.

 9            MR. O'REILLY:  Sorry.

10            THE COURT:  Admissibility has like about four or five

11    different requirements.  Authentication is one of them, so

12    they're certainly linked.

13            MR. O'REILLY:  Yes, your Honor.  What we would have

14    done, if there was an objection to authentication, is bring our

15    witness into court to talk about the printing and

16    authentication of the document but we have an agreement we

17    wouldn't do that, with plaintiff, because they didn't object to

18    authentication.  So that, I believe, is --

19            THE COURT:  Well, let me hear from plaintiffs'

20    counsel.  We may have to continue this discussion in about 15

21    minutes because of the call I have to take, but go ahead.

22            MR. SOLOMON:  I'll make it brief, your Honor.

23            I haven't heard once them say they weren't able to get

24    these document before.  We asked for them in May 2016.  We were

25    delivered the pretrial exchanges --

 1                THE COURT:  You asked for them when?

 2                MR. SOLOMON:  May 2016 we asked for these documents.

 3                THE COURT:  You asked for?

 4                MR. SOLOMON:  In document requests we asked for

 5     exactly this type of document.

 6                THE COURT:  Well, let me hear what the request was.

 7                MR. SOLOMON:  One is, any and all documents the

 8     defendants intend to use at trial, any and all documents that

 9     support defendant's contention in paragraph 54 of the answer

10     that plaintiffs do not possess the most senior claim to a mark

11     which includes the word "velocity" and covering any articles of

12     clothing, all documents that support defendant's contention in

13     paragraph 55 --

14                THE COURT:  Was there any objection to any of these

15     requests?

16                MR. SOLOMON:  No, your Honor.  We've gotten no

17     documents.  And then the initial -- I don't mean to cut you off

18     but the initial --

19                THE COURT:  Thank you very much.  I'm going to cut you

20     off.

21                MR. SOLOMON:  I sincerely apologize, your Honor.

22                THE COURT:  We will resume at a quarter after.

23                (Recess)

24                THE COURT:  So, plaintiffs' counsel was about to say

25     something.

1          MR. SOLOMON:  Your Honor, if I may just start with an

2     apology:  I didn't mean to imply that I was going to ever cut

3     you off.  I apologize.

4          THE COURT:  Don't worry about it.  It's a role most

5     commonly taken by my wife and daughters.  Anyway, go ahead.

6          MR. SOLOMON:  As I was saying, your Honor, the

7     document demands were set out in May 2016, discovery cutoff was

8     October 2016 --

9          THE COURT:  So just so I understand, after you

10    propounded those document requests, there was no objection made

11    to the document request, yes?

12         MR. SOLOMON:  The document requests -- it's several

13    requests, your Honor -- they were responded to by defendants

14    saying look at response 14 and response 25.  Response 14 says:

15    Look at our general objection 7 for unduly burdensome but will

16    produce, and continue producing, as they become available.  And

17    25 was:  We'll produce and continue producing.  So, no

18    particularized objection, no explanation, and they in fact did

19    produce documents.  The discovery gets cut off.  The

20    January 9th, 2017, preliminary exhibits are exchanged.  They're

21    not there.

22              Subsequently your Honor's deadline to file motions in

23    limine expires on the 16th of January.  On January 21st, new

24    counsel produces new exhibits, which include, as I said,

25    updates of the USPTO printouts, which are fine because they'd

 1    have to do that, and a hundred exhibits showing new products

 2    that they allegedly just found, and -- let me rephrase that --

 3    products that they've just elected to find and give to us and

 4    the supporting documentation of those purchases and the

 5    shipments and the receipt of those products.

 6            There is no reason why at any point between May 2016

 7    or --

 8            THE COURT:  Okay.  So let me ask defense counsel two

 9    things:  First, who collected these?

10            MR. O'REILLY:  I did it -- other people did them for

11    me but --

12            THE COURT:  Well, you can't take the stand.

13            MR. O'REILLY:  No.  We have a paralegal who did it,

14    and we were going to have her testify.

15            THE COURT:  It sounds like what she did is something

16    that could be done -- and indeed one would have thought it out

17    to have been done -- weeks, if not months, earlier.  So I think

18    there's a lot of force to plaintiffs' objection that this is

19    grossly untimely.

20            MR. O'REILLY:  I guess there are two separate issues.

21    The first is discovery violations and one is just unfair

22    prejudice generally.  Is that a fair statement, your Honor?

23            THE COURT:  Well, I think you're right, those are two

24    issues.  I also continue to have some question in my mind about

25    how you're going to get this into evidence, but let's start

 1    with the two issues you just identified.

 2            First, why isn't it a gross violation of the discovery

 3    obligations?

 4            MR. O'REILLY:  Your Honor --

 5            THE COURT:  If you're saying that stuff that normally

 6    would be part of a case like this, that you normally would

 7    search for during the discovery period, that you can, in order

 8    to get around the discovery obligations, artificially delay

 9    searching for it until after the discovery is over, as well as

10    all the other things that plaintiffs' counsel just referred to,

11    I don't see why that isn't a violation of the discovery order.

12    It's a total tactical, artificial device, to evade discovery

13    obligations.

14            With respect to prejudice, here they are being

15    confronted with what I understand is like a hundred different

16    documents that they had no ability to put to the test of the

17    discovery adversarial process.  You talk about the paralegal

18    you want to call.  Well, they would have taken the deposition

19    of the paralegal and would have inquired as to the nature of

20    the search and how it was done and what the limitations were

21    and a whole bunch of things.  Now, they're left having to do

22    that, if at all, right in front of the jury, without knowing

23    what the answers will be, which is commonly referred to as

24    ambush.  So I don't understand how this stuff can come in.

25            MR. O'REILLY:  I'll respond to it in a few different

1    parts.

2          Just simply on the discovery front, I don't believe we

3    had a duty to produce documents not in our possession.

4          THE COURT:  I think it's a question of, if you were

5    asked for, as they did, for example, exhibits that you're going

6    to produce at trial now, you might have objected to that

7    request but you didn't.  As I understand it, you simply said,

8    here, we will produce, although reserving our rights to say

9    that it's burdensome or whatever.  So, at that point in time,

10   since you didn't object in any specific fashion to that

11   request, you assumed a duty to figure out, okay, what is it

12   we're going to produce at trial.

13         Now, if you had told me, okay, well, we didn't realize

14   we were going to have to put in this kind of stuff because

15   something unusual, unforeseen, came up two days before trial,

16   that's why we were late, that's one thing, but that's not what

17   you're telling me.  And this sounds like stuff that was

18   self-evidently relevant from day one.

19         So what you're saying is that you chose knowingly,

20   willfully, intentionally to delay what was an obvious kind of

21   search that could have been undertaken at any time during the

22   discovery period until well after the discovery period was

23   closed and then said, we're going to put in this hundred

24   documents or whatever.  That sounds like a violation.  Why not?

25         MR. O'REILLY:  Your Honor, I would respectfully

 1    disagree that we willfully made a tactical decision not to

 2    search.

 3              THE COURT:  Okay.  I don't know the answer to the

 4    willful and so forth.  Let's just assume unintentionally,

 5    inadvertently and without any willfulness whatsoever.  It's

 6    still is a violation, isn't it?

 7              MR. O'REILLY:  I guess we're now moving into

 8    incompetence, I guess, right, your Honor?  No, but what

 9    happened here is, we're preparing, we're preparing for trial

10    we're reading the deposition of plaintiffs' main witness, and

11    he's taking the position that nobody else is using his mark,

12    that in his deposition transcript, that he totally disagrees

13    that anybody's using his mark.

14              THE COURT:  Well, wait a minute, wait a minute.  When

15    you say in his deposition transcript, presumably your colleague

16    was there at the deposition, right?

17              MR. O'REILLY:  Yes, your Honor.

18              THE COURT:  The fact that new counsel comes in is

19    irrelevant.

20              (Continued on next page)

21

22

23

24

25

 1              MR. O'REILLY:  Absolutely, your Honor.

 2              THE COURT:  Yes.  All right.  So there he is.  When is

 3     his deposition taken?

 4              MR. O'REILLY:  After the close of discovery on

 5     November --

 6              THE COURT:  Yes.  And that's because you chose not to

 7     take his deposition?  One of the most obvious things that any

 8     defendant would want to do, the deposition of the plaintiff?

 9     Or why was it not until after the close of discovery?

10              MR. O'REILLY:  I believe it was scheduling conflicts,

11     your Honor.

12              THE COURT:  Scheduled what?

13              MR. O'REILLY:  Scheduling conflicts, I believe, your

14     Honor.

15              THE COURT:  Both sides, if I remember correctly, to be

16     frank, sat on their hands for a good deal of the discovery

17     period in this case.  I can't recall a case of this kind ever

18     in the 21 years I've been on the bench where so little

19     discovery was taken during most of the time period allotted for

20     discovery.  But that's on both sides.  But we're just focusing

21     now on your situation.

22              So the discovery begins -- let me ask my law clerk,

23     what was the original case management plan?  Here we go.  Way

24     back when, when this case was filed -- when --

25              MR. O'REILLY:  I believe it's only eight or nine

1    months ago.  April.  April, your Honor.

2           THE COURT:  April.  I don't have the date in front of

3    me, but my practice would have been to have a scheduling

4    conference within a couple of weeks after that, so discovery

5    was then fair game.

6           The discovery was supposed to be completed by

7    October 5th, putting aside plaintiff's failures in their

8    discovery, that's not the issue before me now.  So between

9    April and October, you had unbelievably full time to take the

10   deposition of the plaintiff, which, forgive me for saying

11   "duh", but it's what any defendant would do.

12          My law clerk just reminds me that on September 16th,

13   less than a month before the close of discovery, counsel for

14   both sides apply for a two-month extension to discovery,

15   basically because they had done nothing.  I gave them two

16   weeks, and I only gave them two weeks because it was, frankly,

17   inexcusable that the parties had done nothing during that time,

18   but I gave them two weeks on their representation that they

19   just absolutely had to have that or they wouldn't be able to do

20   the discovery necessary for this case.

21          Notwithstanding that, on October 14th, in other words,

22   just before the close of that two-week extension, counsel again

23   asked for a two-week extension beyond the earlier two weeks

24   because they hadn't taken depositions.  What is this?  Is

25   this -- did no one go to law school here?  So I allowed,

1  nevertheless, them to take depositions all the way up to

2  November 11th, more that a month beyond the original close of

3  discovery.

4         What I'm now hearing is that after the deposition of

5  the plaintiff -- which should have been, under any reasonable

6  approach, taken months earlier -- after it was over, you, as

7  new counsel, are reading the transcript -- it's not even at the

8  actual deposition -- and you say, 'Oh, my gosh, he's taking

9  this position, we ought to do some investigation of what's on

10 the web to see if we can cross examine him about this.'

11        I want to distinguish two things.  No party ever has

12 to reveal materials that they do not intend to introduce in

13 evidence other than for impeachment, perhaps, that they want to

14 use solely for cross examination, but my understanding is you

15 want to introduce these as affirmative evidence on your behalf.

16        MR. O'REILLY:  I'll take either one, your Honor.

17        THE COURT:  Pardon?

18        MR. O'REILLY:  I'll take either one, your Honor.

19        THE COURT:  I think you're about to only get the cross

20 examination part.

21        Now let me go back to plaintiff's counsel.  I agree,

22 and I think I will now hold, that the production of this stuff

23 was prejudicially untimely to the extent that it's being

24 offered for nonimpeachment purposes, but there's nothing in the

25 rules that say you have to even show your hand, you don't even

1   have to list an exhibit that's being used solely for

2   impeachment purposes, so I don't see what your objection would

3   be if they want to confront the plaintiff and say, 'You said X

4   and you lied because it's Y,' or, 'You had no basis,' is what

5   they'll probably be saying, 'You had no basis to say X.  And

6   what about this, and what about that, and all like that,' in

7   the standard cross examination.  Agreed?

8           MR. SOLOMON:  Your Honor, of course an obligation to

9   disclose tends to be used solely for impeachment.  That's done

10  every day.  The difference is, they're using it to bolster

11  their affirmative defense, not to say my client -- there's only

12  one witness so there's no surprise, Mr. Hedvat.  They're not

13  using it to say Mr. Hedvat -- whatever he said was wrong or

14  that he lied about it, they're using it to demonstrate to the

15  jury that there are other people using this mark and,

16  therefore, you shouldn't find confusion.

17          THE COURT:  Right.  And they can only do that if it

18  comes into evidence.  But at least as it sounds to me it's

19  going to play out given my ruling so far, is they are going to

20  be able to confront him with it and say, 'Weren't you

21  inaccurate when you said X?'  And he'll either say "yes", "no",

22  or "I don't know".  And assuming he says "no", then the

23  question is, do these exhibits come in, assuming they can be

24  authenticated, solely for impeachment purposes, in which case I

25  would have to instruct the jury that they would be considered

1    solely for impeachment, or whether your argument would be that

2    the prejudice outweighs the probative value because the jury

3    will take it as evidence of their affirmative defense as

4    opposed to just impeachment, which is why I think that issue

5    has to be determined at the time the witness is on the stand

6    and is confronted with these exhibits, I don't know if I can

7    deal with them in advance.

8            MR. O'REILLY:  Your Honor, one small point.

9            THE COURT:  Yes.

10            MR. O'REILLY:  We've had this conversation focusing on

11   what we just produced recently.  There are a number of

12   documents -- and counsel did make -- previous counsel made

13   efforts to collect and produce examples in a search report.  So

14   I don't want to pretend that there's no other documents --

15            THE COURT:  If there's something that was timely

16   produced, that's a different question.  If there's an issue

17   about that when you confront the witness with it or otherwise

18   seek to introduce it, counsel should alert me and come to the

19   sidebar and we'll deal with it.

20            MR. O'REILLY:  One other small question.  Counsel said

21   that the unfair prejudices are these new documents and these

22   new exhibits.  We have the previous documents that show

23   third-party uses.  We have new documents to show what currently

24   is and some of the products.  So I think for the ones that were

25   previously disclosed, there shouldn't be any unfair prejudice,

 1   and these are updated versions we couldn't have produced

 2   earlier.

 3           MR. SOLOMON:  If I may respond to that.  Again, I said

 4   from the beginning, I have no objection to them updating USPTO

 5   printouts.  They have to.  That's not a problem.  They can't

 6   introduce an old version when there's a new version that has

 7   subsequent information on it.  And if there's a product or a

 8   collection they asked Mr. Hedvat about at his deposition, those

 9   were on the January 9th pretrial exchanges, I have no objection

10   to that as prejudicial or untimely.

11           The problem is these new documents.  They didn't ask

12   Mr. Hedvat about them at his deposition, and I don't know -- if

13   they just got them now, I don't know whether they were able to

14   get them the first time.  So when questioning Mr. Hedvat about

15   them and implying to impeach him on 'Do you police our mark?

16   Here's a garment we just got,' I don't know when that garment

17   became available, I don't know if he would know the answer, but

18   the jury will now have heard and be impacted by this exhibit,

19   and then they're going to be told, 'Look how many people sell

20   the same clothing.'

21           THE COURT:  Well, I think probably each situation has

22   to be dealt with on its own terms rather than generically.  So

23   for example, if there's an "updating" that could have been done

24   much earlier, that may be a problem.  Also, the mere fact that

25   it's updating is not a total answer -- for example, this is a

 1    slightly different analogy -- but if an expert testifies in his

 2    report or makes a report and says, 'Here's the lay of the land

 3    today,' the fact that between then and trial the lay of land

 4    becomes different, he can't testify about that because the

 5    parties had a right to rely that his report was definitive.

 6    This is not the same as an expert's report, but this is why I

 7    think it's a multifactor issue that has to be determined on

 8    each individual item as they come up.

 9          I think the basic guideline that I'm giving you now

10    is, anything that was just recently produced is presumptively

11    only available for cross examination, but that can be overcome

12    in the case of a particular item if it's shown to be an

13    updating of an earlier properly produced item and leading,

14    we'll take it up individually.

15          MR. SOLOMON:  I don't mean to belabor the point, I

16    understand the Court's position.  I just would reiterate that

17    these products in particular that I'm trying to address are

18    ones that were just purchased in January, 2012 -- I'm sorry --

19    approximately January 12th, 2017.  So they're not updatings,

20    they're just new stuff.

21          THE COURT:  No, they're not updating, that's -- you've

22    got my ruling.

23          MR. SOLOMON:  I understand.

24          THE COURT:  All right.

25          Is the jury ready?

1           THE DEPUTY CLERK:  Ten minutes.

2           (Discussion off the record)

3           THE COURT:  We normally in this district do not do a

4  transcript of jury selection, unless any party wants it.  Does

5  any party want it?

6           MR. O'REILLY:  No.

7           MR. SOLOMON:  No, your Honor.

8           THE COURT:  Very good.  Thank you.

9           (Jury selection ensued)

10          THE COURT:  We normally in this district do not do a

11 transcript of jury selection, unless any party wants it.  Does

12 any party want it?

13          MR. O'REILLY:  No.

14          MR. SOLOMON:  No, your Honor.

15          THE COURT:  Very good.  Thank you.

16          (Jury selection ensued)

17          (A jury of 8 was impaneled and sworn)

18          (Trial resumed; jury present)

19          THE COURT:  Please be seated.

20          Ladies and gentlemen, we're about to hear opening

21 statements of counsel.  I want to caution you that nothing that

22 counsel says is evidence.  Evidence, as you've already heard me

23 say, will come from the witnesses, from the exhibits, and

24 perhaps from stipulations.  Those are the only sources of

25 evidence.  But the evidence will come in one witness at a time,

 1    one exhibit at a time, so it may be useful for you to hear in

 2    advance what each side believes the evidence will show or fail

 3    to show as the case may be.

 4          The plaintiff has what we call the burden of proof,

 5    I'll explain that to you later, but for that reason,

 6    plaintiff's counsel goes first.

 7          MR. SOLOMON:  Thank you, your Honor.

 8          Good morning, ladies of the jury.  My name is Aaron

 9    Solomon.  I'm an attorney with Oved & Oved, LLP, and we

10    represent the plaintiffs, which is this gentleman right here on

11    the right, Mr. Hedvat, his companies, plaintiffs 4 Pillar

12    Dynasty, LLC and Reflex Performance Resources, Inc.  Those are

13    the plaintiffs.

14          In 1979, Mr. Hedvat was forced to leave his parents

15    behind and come to this country with his brother and a

16    suitcase.  Taken in by a family in Atlanta, he goes to school,

17    attend college, Emory University, but he has to drop out

18    because he can't afford to continue.  So he works in fast food,

19    works in pizzeria as a dishwasher, eventually his way up --

20          THE COURT:  Counsel, I'm sorry to interrupt, but this

21    is a case about trademark infringement, not about hearts and

22    flowers.  Let's get to the case.

23          MR. SOLOMON:  1990, Mr. Hedvat travels to New York to

24    learn the apparel and fashion industry.  He apprentices in the

25    apparel and fashion industry.  By 1990, he sets out on his own.

1    He focuses on manufacturing Spandex clothing.

2          For the past 25 years, Mr. Hedvat and his two younger

3    brothers, who eventually also came over, have focused in the

4    apparel industry on manufacturing Spandex clothing.  The

5    companies went through different names.  Presently, it's

6    plaintiffs 4 Pillar Dynasty and Reflex.

7          10 years ago, the plaintiffs developed a name,

8    Velocity, in connection with the sale of Spandex clothing, but

9    in particular they used Velocity for yoga pants, leggings,

10   capris, and sports bras, and they put the mark -- they put that

11   name on the products.  The names in the back of the product

12   where you find a tag on a men's shirt or T-shirt, in the back

13   of pants we might find a label for underwear.  They have a V

14   for Velocity on the back of the pants, the back of the sports

15   bra.  You buy the products online.  They're shipped to you in a

16   bag that says Velocity on the bag.  They sell these products to

17   consumers like you, and they sell them to retailers who then

18   sell them to consumers.  Their products are in TJMaxx, Ross

19   stores, Burlington, Footlocker, Ladies Footlocker, Dicks Sports

20   Goods, and they sell them online.

21         When they sell the products to the retailers, they're

22   sold for showroom.  The showroom is in Manhattan, the buyers

23   come to the showroom, and they look at what's called a look

24   book.  Put the menu, the menu look book shows Velocity

25   products.  Look book says Velocity on the front cover.  The

1    showroom says Velocity on the front door of the showroom.  The

2    products in the showroom say Velocity.

3         Ten years ago, Mr. Hedvat testified he didn't know you

4    could file a trademark and register a trademark, but as you

5    grow and you become more sophisticated, you learn.

6         Eventually, they decide that all the money they put

7    into this brand, this Velocity brand, they're going to file a

8    registration for, and that's what brands are all about.  Brands

9    are everything.  People protect their brands, people are

10   focused on their brands because we use brands to make our

11   purchases, especially the purchases aren't expensive purchases.

12   But in all purchases, we take that brand, that name, that logo,

13   if it's a logo -- here's, it's just a word, "Velocity" -- and

14   associate it in our mind with the product.  And that

15   association, the fact that you see that word and it registers

16   in your mind, you know what that product is, you want that

17   product, you like that product, you know someone who has that

18   product.  That connection is there because people have worked

19   hard for years to make that connection through advertising,

20   through selling to retailers, to making sure their products are

21   quality products at the right price, in the right stores.

22         (Continued on next page)

23

24

25

 1              MR. SOLOMON:  (Continuing)  2012, plaintiffs filed for

 2     a trademark application to get a registered trademark with the

 3     federal government, with the United States Patent and Trademark

 4     Office.  You're going to hear the word "USPTO" a lot.  It's

 5     short for United States Patent and Trademark Office.  They

 6     filed the application to register to have the U.S. Government

 7     issue a certificate that Velocity will be plaintiffs'

 8     registered trademark in connection with certain goods,

 9     particularly yoga pants, leggings, capris, and sports bras.

10     U.S. Government, the USPTO, processed that registration, they

11     consider it, and they eventually issue a registration to

12     plaintiffs.

13              You'll see a certificate.  This is the registration

14     that gives you a federal protected trademark, which means that

15     the entire country was on notice that the word Velocity in

16     connection with leggings, capris, sports bras, yoga pants

17     belong to Mr. Hedvat and his family, his companies.

18              In 2015, New York & Company decides they're going to

19     start selling a collection of yoga pants, leggings, capris, and

20     sports bras using a name, and of all the names in the entire

21     English language, they picked Velocity.  But being a publicly

22     traded company, before they used the name, they did what's

23     called a trademark search.  They had another company check to

24     see if anyone is using this mark, is anyone using Velocity as

25     their registered trademark, are we okay to use it.  The search

 1    comes back.  The search shows Mr. Hedvat and his companies,

 2    they own the trademark, they own the word Velocity in

 3    connection with yoga pants, leggings, capris, and sports bras.

 4    And defendants have a choice to make.  They're at a crossroads.

 5    What do they do?  Do they pick any other word in the English

 6    language?  No.  They decide they're going to do it anyway, but

 7    they need to have an end run, a way to get around the fact that

 8    him and his family have worked for 25 years, ten years in

 9    particular with this mark.  So what do they decide to do?  They

10    tack NYNC on the front of the word Velocity and start selling

11    the same exact products plaintiffs sell to the same exact

12    people.

13            Eventually, Mr. Hedvat finds out about this, retains

14    us, and we file this lawsuit.  Do they stop?  No, they don't

15    stop.  In fact, you're going to hear that their witness

16    testified at deposition, which was testimony given in a

17    lawyer's office prior to this case, but prior to being in

18    court, she testified that they started in 2015, but right away,

19    two, three months later, by November/December 2015, they

20    stopped, they took Velocity down, they didn't use it anymore.

21    So, what Mr. Hedvat saw on the website of their company, New

22    York & Company's website had Velocity on the front page and the

23    home page, it's all gone, it's down, took it down from the

24    stores, it's all down.  We'll show you that's not true.  That's

25    not true.

 1              We'll show you that to this day, they're still using

 2     Velocity, using Velocity to sell products, leggings, capris,

 3     sports bras, and yoga pants.  They're using it on their

 4     website.  They're using it in what's called metadata, which is

 5     code embedded in a website, which when you search on the

 6     website the word Velocity, you're going to see leggings,

 7     capris, sports bras, and yoga pants.  They may not call them

 8     Velocity anymore, but the same products will come up.  They're

 9     still using his name to drive you to the products.  So they

10     don't stop.

11              Now, they're going to come up, and they're going to

12     tell you, it's okay, you can let us get away with it, we have

13     an excuse.  And they basically have three things they're going

14     to try and tell you.  They're going to tell you, one, I never

15     heard of 4 Pillar Dynasty, I never heard of Velocity.  They may

16     not have heard of 4 Pillar Dynasty LLC.  I wouldn't expect you

17     to.  But when they say they never heard of Velocity for

18     leggings, capris, yoga pants, and sports bras, why did they use

19     that word?  Of all the words in the English language, why did

20     they pick that one to sell their own leggings, capris, yoga

21     pants, and sports bras?  Why, after they did a trademark search

22     saying it's already owned by Mr. Hedvat's company, do they say

23     let's do it anyway, and why, after they were sued, do they keep

24     doing it.

25              They're also going to tell you lots of other people

1    use the word Velocity, too, for clothing, it's okay.  The

2    analogy would be because other people knock off Louis Vuitton

3    on Chinatown -- on Canal Street, that Louis Vuitton doesn't

4    have a trademark, it's okay.  But everyone who's been pulled

5    over by the police on the highway telling the officer that

6    other people are speeding, too, doesn't really get you very

7    far.  The more successful your brand becomes, the more you sell

8    to different stores, more people want to latch onto you.

9    That's just the nature of business.

10           The last thing they're going to tell you is when we

11   tacked New York & Company onto the front, nobody would be

12   confused.  Nobody would think we had anything to do with you.

13           Our position is, you putting New York & Company next

14   to Velocity, whether in the front or behind, we own the word

15   Velocity.  We own the word, we own -- it doesn't matter if you

16   change the font, the color, the size, the shape, that's our

17   word for leggings, capris, yoga pants, and sports bras.  You

18   tacking New York & Company on the front of it, all that does is

19   make people confused that you and I are working together, that

20   you called us up and said, hey, we'd like to do a line with

21   you, let's have an agreement.  People might think we have some

22   sort of relationship together, we're working together, we

23   licensed it to you.  We didn't.  They never called us.

24           At the end of the case, we're going to ask you to find

25   if the average person would believe there is a confusion or

1  likelihood of confusion between our mark, the word Velocity,

2  for leggings, capris, yoga pants, and sports bras with

3  New York & Company's use of NYC Velocity in connection with

4  leggings, capris, sports bras, and yoga pants.  We're going to

5  ask you to find that we have a registered trademark, that the

6  average consumer would likely be confused by this use of the

7  word.  We're going to ask you to return a verdict of the

8  profits they made, $1.864 million from 2015 to now selling

9  leggings, capris, sports bras, and yoga pants using our word

10 Velocity.  We're going to ask you, as the law provides and the

11 Judge will instruct you, if you find for us, to turn those

12 profits over to us -- they should never have had them in the

13 first place -- and set this right.

14            Thank you very much.  Appreciate your service.

15            THE COURT:  Thank you very much.

16            Now, we'll hear from defense counsel.

17            MR. O'REILLY:  This case is about confusion.  Whether

18 or not there's a likelihood that a consumer is going to walk in

19 to New York & Company, look at marketing saying NY&C Velocity

20 and think they're purchasing plaintiffs' product or, as they

21 argue, the consumer thinks that New York & Company is licensing

22 the product from plaintiffs.

23            You're not going to hear any evidence of actual

24 confusion.  There is no evidence of actual confusion in this

25 case.  There's no evidence that anybody has ever been confused.

1    That's because the evidence is going to show you there isn't a

2    likelihood of confusion.  It's going to be overwhelming that

3    it's unlikely a woman -- it is a woman, New York & Company

4    doesn't sell to men -- a woman walks into New York & Company

5    and thinks, oh, they must be licensing those yoga pants from

6    Reflex Performance Resources.

7              Now, you're going to hear evidence that New York &

8    Company is a specialty retailer.  What does that mean?  It

9    means they only produce and sell their own products.

10             You're going to hear evidence that consumers

11   understand that New York & Company is a specialty retailer.

12   You're going to hear evidence that over 50 percent of their

13   customers have credit card rewards.  They take the time -- they

14   like the store so much, they sign up for a credit card.  You're

15   going to hear evidence that these people understand that New

16   York & Company is a specialty retailer.

17             You're going to hear from Christine Munley.  She's the

18   head of merchandising at New York & Company.  She's going to

19   tell you what New York & Company is all about.  She's going to

20   tell you their mission is to give her what she wants when she

21   wants it.  She's going to tell you that she spends an

22   inordinate amount of time shopping, looking at what competitors

23   are doing, looking at what women want, understanding the

24   market.  She's going to tell you that she's never heard of

25   Velocity branded apparel from Reflex Performance Resources.

1          You're going to hear from Yelena Monzina.  She's the

2   creative director at New York & Company.  She's been there 14

3   years.  She started off as a graphic designer there.  She

4   worked her way up to the head creative director at New York &

5   Company.  She's going to tell you about her job, which is to

6   create marketing for their products, to tell stories to the

7   customer, to convey what the product is about.  She's going to

8   tell you that New York & Company, the heart of the company,

9   revolves around New York City, around the city.  They have

10  lines of product named SoHo Jeans, Seventh Avenue.  Everything

11  at New York & Company revolves around New York City.

12         She's going to tell you they design the stores.  The

13  actual stores, when you go in, it's designed like a city.

14  There's an uptown, there's a downtown.  Maybe after this, there

15  will be a courtroom section, I'm not sure.  But she'll explain

16  to you that whenever they do marketing, it's with the city in

17  mind.

18         Now, why is that important?  You just heard that they

19  could have picked anything, it could have been any name, that

20  they picked this, I guess, because they wanted to ride on

21  plaintiffs' coattails.  They did it because they focus on the

22  city.  And this was an activewear line, Velocity, speed,

23  movement.  It had the word "city" in it, and to them, that's

24  important.

25         When they created their graphic, they split Velocity

1   into two words, V-E-L-O, C-I-T-Y, with lines through the city

2   because they wanted to emphasize city.  Yelena's going to tell

3   you that she thinks about confusion whenever she designs a logo

4   or picks a word.  She's going to tell you that she never

5   believed for a second any consumer could ever be confused, when

6   shopping at New York & Company, that they were buying anything,

7   anything, but a New York & Company product.  And she'll tell

8   you that's exactly the opposite of what they want to do.  They

9   want people to walk into their stores and think, I'm buying a

10  New York & Company product, this store is unique, what we do is

11  important.  And you're going to hear them, they're going to

12  tell you how important it is to them.  They dedicate their

13  careers to creating unique clothing and conveying that message

14  to the shoppers.

15          She's going to tell you that she did, in fact, order a

16  search report when she got to the end to see if there was

17  anything wrong with their using NY&C Velocity, because after a

18  name gets through her personal vetting process, which is if she

19  thinks it's going to cause any confusion or mislead any

20  consumers, she's doesn't use it.  Once it gets through that

21  process, she goes to the next process, and that process is

22  let's see what the search report company says.  This search

23  report said, yes, they had a trademark.  So did lots of other

24  people with Velocity.  Nobody owns the word Velocity.  You

25  can't own a word.  You can misuse a word, such that it causes

 1    confusion.  But they felt very comfortable that nobody would

 2    walk into New York & Company -- especially when putting NY&C,

 3    their famous house mark in front of it, nobody's going to walk

 4    in there and say, oh, that's plaintiffs' product right there,

 5    New York & Company must have licensed it.  They never licensed

 6    things, but that Velocity, I know that brand, and that's a

 7    great brand, they must have licensed it.  They never thought

 8    for a second that was a possibility.  There were many

 9    trademarks using the word "Velocity."  The report showed lots

10    of other people using the word "Velocity" for activewear.

11    There was a report of lots of people using the word "Velocity,"

12    lots of products.  You know who wasn't in that report?  You

13    know whose product wasn't listed by this independent third

14    party?  Plaintiff wasn't in that report.  Their trademark was

15    along with a lot of other people's.  Yelena's going to tell you

16    she doesn't even remember specifically seeing his or theirs.

17              Now, I want to contrast New York & Company with the

18    plaintiffs here.  Now, undeniably, New York & Company is a big

19    company, it's publicly traded.  They had over a billion dollars

20    in sales last year.  That is a lot of money.  But they also

21    have thousands of stores across the United States.  I'm sorry,

22    hundreds of stores, thousands of employees.  People dedicated,

23    hundreds, to creating unique store layouts, unique messages,

24    and unique clothing.  Plaintiff is no small family-run

25    business.  They claim to have $250 million in sales a year.

1   That's a quarter of New York & Company.  With three brothers.

2           Now, that's impressive.  That is impressive.  Three

3   brothers create a $250 million a year company.  But how do they

4   do it?  Do they have thousands of employees?  Do they have

5   hundreds of people working, trying to give her what she wants

6   when she wants it?  No.  They sell stock products through their

7   showroom to discount retailers, and there's nothing wrong with

8   that.  But they're not in the business of building a brand.

9   They're in the business of pushing product through a showroom.

10  Again, there's nothing wrong with that, but it's not the

11  business of building brands.  It's not the business that's

12  going to create a product that people are going to walk into

13  New York & Company and say, oh, that's the product Mr. Hedvat

14  created and sells through Performance Resource or Reflex

15  Performance Resource.  That's not their business.

16          Let's compare Mr. Hedvat's actions to the actions of

17  New York & Company.  You're going to hear all the steps -- and

18  I just explained them to you -- that Yelena took to make sure

19  she wasn't confusing anybody.  Now, they say because she took

20  so many steps, she was willful.  Because she took the time to

21  search, that she did it willfully because she knew about all

22  the information.  Well, when Mr. Hedvat launched his line, his

23  Velocity line, you're going to hear he didn't search the

24  Internet, he didn't know what people were doing.  He didn't

25  care, just slap the label on it, it goes out the door.

1          Compare that with Yelena.  She acted willfully because

2     she took the time to figure out what was going on and made an

3     informed decision that they didn't have a likelihood of

4     confusion.  That's the willfulness here.  Should she have acted

5     like Mr. Hedvat, and just buried her head in the sand and said

6     I don't care what happens, I don't care what people think?  If

7     I don't know, I can't get in trouble, right?

8          Well, that's the claim here today, that because of the

9     efforts taken by Yelena, she acted willfully instead of

10    recognizing the efforts that she took, and looking at the facts

11    and saying, you know what, I don't think people are going to be

12    confused.  I know my customers, I don't know them, my customers

13    don't know them, they're not going to be confused.

14         Now, I'm going to leave you with some testimony from

15    Chris.  You're going to hear this.  Chris is going to tell you

16    that when she heard the name NY&C Velocity, she did, Yelena

17    said, hey, Chris, what do you think about this?  She said, I

18    think it's a pretty good name.  We used to have another name in

19    the activewear called In Motion, NY&C In Motion.  So we liked

20    the motion thing, and you've got the city, great, we like that

21    part, too.

22         She's going to tell you never for a second did she

23    think it could cause confusion.  And you know why?  She's going

24    to tell you that her job is to understand what her consumer --

25    what her customer knows, what her customer -- how her customer

1     reacts, and she's going to tell you she thought it was

2     impossible that anybody could be confused, because she couldn't

3     have been confused, and her customers don't, never, know more

4     than she does.  So she thought there was no chance anyone could

5     be confused.

6                Thank you.

7                THE COURT:  All right.  Very good.

8                Counsel will call their first witness.

9                MR. SOLOMON:  Thank you, your Honor.

10               Plaintiffs call Mr. Behrooz Hedvat to the stand.

11     BEHROOZ HEDVAT,

12         called as a witness by the Plaintiffs,

13         having been duly sworn, testified as follows:

14               THE DEPUTY CLERK:  State your name and spell it slowly

15     for the record.

16               THE WITNESS:  My name is Behrooz Hedvat,

17     B-e-h-r-o-o-z, last name is Hedvat, H-e-d-v-a-t.

18               THE COURT:  Counsel.

19               MR. SOLOMON:  Thank you, your Honor.

20     DIRECT EXAMINATION

21     BY MR. SOLOMON:

22     Q.  Good morning, Mr. Hedvat.

23     A.  Good morning.

24               THE COURT:  I think, so that both sides can hear, you

25     should go to the microphone over there.

1              MR. SOLOMON:  Thank you, your Honor.

2              Your Honor, if I may, I just want to make sure, when I

3     introduce an exhibit, I'm going to hand the two sets to the

4     Court, obviously, and also one set to opposing counsel.

5              THE COURT:  Okay.

6     Q.  Mr. Hedvat, where are you presently employed?

7     A.  Me and my two brothers presently own 4 Pillar Dynasty and

8     Reflex Performance Resources, and we work for those companies.

9     I work for those companies.

10    Q.  What do those companies do?

11    A.  Reflex Performance Resources, we design, produce,

12    manufacture yoga performance activewear line, which is

13    leggings, capris, bras, and tank tops.

14             And 4 Pillar Dynasty was created as an entity to hold

15    several names that we registered, including Velocity.

16    Q.  Just so I'm clear, 4 Pillar Dynasty holds the trademark.

17    What is the relationship of those trademarks to Reflex

18    Performance?

19    A.  Reflex Performance Resources pays a royalty to 4 Pillar

20    Dynasty for using their labor, but eventually we both -- we own

21    both companies.

22    Q.  And the products that are designed, manufactured, they're

23    designed by Reflex or by 4 Pillar?

24    A.  Reflex.

25    Q.  When did you and your family begin operating companies that

1   design and manufacture apparel?

2   A.   About 25 years ago.

3   Q.   Can you briefly describe how you and your brothers came to

4   be involved in the apparel manufacturing industry?

5   A.   We came in -- we migrated to United States in 1979.  We

6   stayed in New York for a few months, and we moved to Atlanta to

7   live with a family friend, which we started living in Atlanta,

8   going to school, going to college.

9        Obviously, after high school, I went to a state

10  university, and after, I transferred to NYU University to start

11  a premed education, but it became very expensive, and we

12  couldn't afford it.  I couldn't afford it anymore because I

13  wasn't resident, so I ended up dropping out, out of university,

14  and leaving it because I couldn't afford.

15       I started working in the fast food industry, Pizza

16  Inn, Pizza Hut, Taco Bell, and eventually I started working for

17  a local pizzeria in a mall in Atlanta.  Italian gentleman owned

18  it.  So I started with being a dishwasher, to cook, to cashier,

19  to manager.  The owner offered me 10 percent ownership because

20  of the fact that I was running the whole show.  When he retired

21  several years later, I bought the pizzeria from him and made

22  arrangements to pay him over years for the purchase of the

23  pizzeria, and me and my family eventually opened up four

24  pizzeria and Italian restaurants.

25       As years went by, and my parents migrated to United

1   States, we wanted to do something besides food, something more.

2   My father suggested, and we decided that I should go to

3   New York and start working with my cousins, who were in apparel

4   business already.

5   Q.  How old are you at this point that you start working in the

6   apparel industry?

7   A.  Probably 23, 24.

8   Q.  I'm sorry.  Go on.

9   A.  So I started working in the --

10          THE COURT:  So it was only a year ago?

11          THE WITNESS:  Yes.  Thank you.  Take that for a

12   compliment.

13          So I started working in the garment district with my

14   cousins and learning all ends of the business as far as

15   manufacturing.

16          Probably nine months after that, I decided that I want

17   to go on my own.  So learning the trade, it was proven to me if

18   I concentrate enough doing a specific garment or a specific

19   group of garments, I could be best at it, customers would come

20   back and look for that item or items that I have concentrate on

21   producing.  So I started producing leggings, all kind of

22   leggings, but mostly toward exercise.

23          As it became more successful, and I produced it, and I

24   was selling it to the retailers and to the wholesalers, I met a

25   lady by the name of Elke.  She was an ex-designer that I met

1    her in the coffee shop.  She was doing freelance -- doing

2    specific designs and original designs, and she would sell it

3    for a hundred dollars.  So I started working with her.  She

4    would design new products as far as leggings or tank tops to my

5    specifications and to her suggestions.  And the business

6    started growing.

7         Within the years that I started this, I came up with

8    several different names that we would put on the product,

9    Isabella Rodriguez, Hannah Jones, Sweet Juliet.  One day that I

10   came to the showroom, Elke told me that for a token of

11   appreciation that I've brought her from just -- because she was

12   a designer that she was laid off, and she was doing freelance,

13   and now she was all busy, all happy, for a token of

14   appreciation, she asked me to put on my suit for the next day,

15   she has a surprise for me.  The next day I come in, she was

16   sitting with a lady.  She introduced me, I forgot the name.

17   She was from Lord & Taylor.  She started telling her what we

18   do, what we are good at, the designs that we do, and sure

19   enough, they agreed that I'm going to produce a line for Lord &

20   Taylor.  We called it Elke.

21        As they were working, and as they were ordering, I'm

22   overwhelmed, I called Atlanta -- that's where it was -- I told

23   everybody to sell everything, send all the money to me because

24   I needed it for fabric, for sewing, and I told them we are

25   billionaires, and all of you move to New York, but give me the

1   money, and that's it, I had hit the jackpot.

2           As their garments coming to the showroom, we had a

3   small showroom, I'm asking Elke how can we ship these goods,

4   we've got to ship these goods, and she's telling me we waiting

5   for a PO.  At that time I don't know what a PO is.

6   Q.  I'm going to cut you off.  I don't know if everyone does.

7           What is a PO?

8   A.  Purchase order.  When a company buys stuff, obviously they

9   come to your showroom, you show them the product, they write

10  the order and the purchase order, and you use that number to

11  ship the goods to get paid by, and that's the reference number

12  that is used in the industry.

13          It came to the point that goods start arriving and

14  piling up, and we even start putting ropes on the steam pipes

15  to hang the clothes just to show that goods were piling up.

16  And one day Elke tells me I have some bad news, Lord & Taylor

17  is not going to take the goods, we couldn't get the PO, and

18  they canceled it, and they walked away.  The whole world

19  collapsed on me.  First thing was how I'm going to answer my

20  family that I took everything that we earned so many years,

21  what to do with the losses, what to do with these goods.

22          Within few days that I had some friends in the

23  industry, they introduced me to TJ Maxx.  TJ Maxx came in, and

24  they offered me four dollars, five dollars or six dollars, I

25  don't remember, to take the whole thing, something that cost me

 1    twelve to fifteen dollars.  It was a very hard decision to make

 2    because it was a humongous loss of our own money that we earned

 3    throughout the years through the restaurant business and

 4    through the accumulations of everything that I had to put in to

 5    do these orders, pay on time, paying everything for the fabric,

 6    for sewing.  I made the decision to sell the goods to TJ Maxx

 7    at a loss and didn't know what to do exactly, how to answer to

 8    my family.

 9          A month later that things were still in shambles, and

10    I didn't know what to do, TJ Maxx calls and said, good news, we

11    blew out the goods, we want more.  So I'm thinking how I'm

12    going to give these goods, how I'm going to produce.  It forced

13    me to start sourcing factories within United States and

14    overseas to be able to do the same product for the prices that

15    TJ Maxx wanted, and the business started.

16          As the business started, more TJ Maxx, I remembered it

17    was New Year's Eve, and everyone is coming up with the New

18    Year's resolution to lose weight, to go to the gym.  So, me and

19    buyers at TJ Maxx discussed that we should put a line together

20    to emphasize this product, but we've got to come up with a

21    name.

22    Q.  I just want to get some context in terms of time, so let's

23    just back up for one second.

24          When, about, is this happening?  This New Year's

25    people discussing exercise, when, about, did that happen?

1   A.   It's around 2004, 2005, 2003.  I don't exactly.

2   Q.   Up to that point, you had mentioned your family company

3   using, I think you said, Hannah Jones, Isabella Rodriguez and

4   Sweet Juliet as brands?

5   A.   Yes.

6   Q.   So, up until this 2004-2005 point, your companies had used

7   brands on their products in the past, right?

8   A.   Yes.

9   Q.   I'm sorry, that's 2004-2005, and you're discussing the new

10  focus for the company?

11  A.   Yes.

12           So, again, my success happened to be in New York City,

13  and we discussed with TJ Maxx exactly what kind of labeling we

14  wanted put on this.  So I'm sitting just like the other labels

15  that I chose, Isabella Rodriguez, Hannah Jones, I wanted to do

16  something that has to do with the product that has to do with

17  New York City, and has to do with me being there and producing

18  it there.  So it happened that we came up with the name -- that

19  I came up with the label Velocity.  They loved it.  We start

20  producing the label and the garments, we start shipping it, and

21  starting this activewear performance and the legging line,

22  selling it to TJ Maxx at the store, but we expanded selling it

23  to Ross stores, Burlington, Daffy's, Value City Department

24  Stores, and it became -- yes.

25  Q.   I want to cut you off for a second.  We're now in

1   2004-2005, you come up with the word Velocity, you said, for a

2   new line of clothing.

3       What exact products were your companies using Velocity

4   for?

5   A.  For legging, capris, sports bra, sports tanks, and some

6   hoodies.

7   Q.  How did you come up with the name Velocity for leggings,

8   capris, yoga pants?

9   A.  Again, it came to the point that we were going to -- I told

10  TJ Maxx that we've been in New York City all this times, we've

11  been producing here, and in a funny way, I was sitting in a

12  sauna, and I was thinking about what a beautiful city, New York

13  City, I love New York, what a city, what's going on with the

14  city, we were going to coordinate something, it was too big of

15  a word, and the word Velocity popped up.  So that's how we said

16  it.  We discussed it with the TJ Maxx buyers -- sorry, my mouth

17  is dry -- so we decided to go for it.  They loved it.

18      The fact that we used Velocity, it had at the

19  beginning and up to now, nothing to do with the fact that it

20  was exercise, nothing that it was to do with the stretch,

21  nothing has to do with the product, it has to do with the

22  quality, it has to do with the better fabrication, better

23  sewing, and better quality of the garment that we would go to

24  the consumer, and that's what they know me for.  They know me

25  for the quality, they know that they going to come back to me.

1   There were a few pairs of the leggings and the bras, and they

2   could keep coming back for more because it last longer,

3   performs better.

4           So --

5   Q.  In 2004/2005, about ten years ago, you come up with the

6   name Velocity for leggings, yoga pants, capris, and sports

7   bras.

8           Do your companies use it consistently from that point

9   to the present?

10  A.  Yes.  Continuously, even more right now.

11  Q.  Back then, in 2004-2005, what was the name of the company

12  that used the product -- that used the word Velocity?  Was it

13  4 Pillar Dynasty, was it Reflex, was it some other name?

14  A.  No.  We had few companies that opened up for different

15  reasons.  I think it was Munchies of Hong Kong.

16  Q.  So Munchies?

17  A.  Yes.  At that time, again, we were sourcing out our

18  factories in New York City, which is Canal Street or garment

19  district, but we were also overseas in Hong Kong.  So I sat

20  down and just liked the names that I always come up with, I

21  thought these are goodies from Hong Kong, so I called it

22  Munchies of Hong Kong.

23  Q.  In 2004/2005, when you came up with the name Velocity for

24  leggings capris, sports bras, and yoga pants, did you trademark

25  it then?

1    A.  No.

2    Q.  Why not?

3    A.  We didn't know.  My concentration was to produce the goods,

4    to make it better, to use all my experience to give the garment

5    to TJ Maxx and other stores, so they could come back for more

6    order, more -- but we didn't know better.  We were just

7    spending so much time to design it, to produce it, and we never

8    thought about it.

9    Q.  Did there come a time when you eventually -- you and your

10   family eventually did file a trademark application for the word

11   Velocity in connection with yoga pants, leggings, capris, and

12   sports bras?

13   A.  Yes.

14   Q.  When was that?

15   A.  In 2012, on the advice of our lawyers, we took the label

16   Velocity and trademarked it.

17           MR. SOLOMON:  Your Honor, at this time, I'd like to

18   introduce my first exhibit.

19           THE COURT:  Go ahead.

20           MR. SOLOMON:  We'd like to mark for identification

21   Plaintiffs' Exhibit 1.

22           Your Honor, we have two for the Court.  Is it okay if

23   I walk them up?

24           THE COURT:  Yes.  Sure.

25           MR. SOLOMON:  Thank you.

 1              THE COURT:  Have you shown the witness a copy?

 2              MR. SOLOMON:  I have not, your Honor.  Would you

 3    prefer if we used the computer or hard copies of the exhibit?

 4              THE COURT:  Either one.  But you can't use the

 5    computer screens that are available to the jury until the

 6    exhibit is in evidence.

 7              MR. SOLOMON:  Of course, your Honor.

 8              I'm just going to walk this one up, if that's okay

 9    with your Honor.

10              THE COURT:  All right.  Fine.

11              Is there any objection to the admission of this

12    exhibit?

13              MR. O'REILLY:  No, your Honor.

14              THE COURT:  Exhibit 1 is received, Plaintiffs' Exhibit

15    1.

16              (Plaintiffs' Exhibit 1 received in evidence)

17              MR. SOLOMON:  Thank you, your Honor.

18              May I present it to the witness?

19              THE COURT:  Yes.  If you want to ask the witness

20    questions about it, show it to the witness.

21              MR. SOLOMON:  At this time, your Honor, since

22    Plaintiffs' Exhibit 1 is in evidence, may we publish it to the

23    jury?

24              THE COURT:  Yes.

25              MR. SOLOMON:  Hopefully everybody has it now.

1   BY MR. SOLOMON:

2   Q.  Mr. Hedvat, you have Plaintiffs' Exhibit 1 in front of you.

3   What is this?

4   A.  The trademark application.

5   Q.  This is a trademark application filed by which company?

6   A.  4 Pillar Dynasty LLC.

7   Q.  Okay.  For which mark?

8   A.  Velocity.

9   Q.  This is the trademark application that you've just

10  testified 4 Pillar filed in 2012?

11  A.  Yes.

12  Q.  If you turn to the second page of the exhibit, on the

13  bottom, there's a date.  Can you read that date, please?

14  A.  3/12/2012.

15  Q.  What does that date mean?

16  A.  That's the date that we applied.

17  Q.  If you go down the first page, for identification, it's

18  four boxes up from the bottom.  Do you see that?

19  A.  Yes.

20  Q.  In connection with what goods was 4 Pillar applying for

21  federal registration for the word Velocity?

22  A.  You want me to read it?

23  Q.  Please.

24  A.  "Clothing and performance wear; namely, pants, shirts,

25  jackets, yoga pants and tops, sport bras, tank tops, leggings,

1    loungewear, hooded sweatshirts, T-shirts, denims, bicycle

2    shorts, socks, tights, and sweaters."

3    Q.  In the end of the day, sitting here today, do plaintiffs

4    focus on all of those products or only some of those products?

5    A.  Only some.

6    Q.  Which products do plaintiffs use the Velocity trademark in

7    connection with?

8    A.  Leggings, capris, sports bras, sport tanks, and hoodies.

9          MR. SOLOMON:  I'd like to mark our second exhibit,

10   which is Plaintiffs' Exhibit 2 for identification.

11         THE COURT:  Any objection to Exhibit 2?

12         MR. O'REILLY:  I don't know what it is.

13         I have no objection, your Honor.

14         THE COURT:  Exhibit 2 is received.

15         (Plaintiffs' Exhibit 2 received in evidence)

16         MR. SOLOMON:  Your Honor, may I approach?

17         Your Honor, may we publish it to the jury?

18         THE COURT:  Yes.

19         MR. SOLOMON:  Thank you, your Honor.

20   BY MR. SOLOMON:

21   Q.  Mr. Hedvat, you have in front of you what is now

22   Plaintiffs' Exhibit 2.  What is this?

23   A.  This is the certificate that United States Patent and

24   Trademark Office granted us the label Velocity registered

25   trademark belong to 4 Pillar Dynasty.

1  Q.   Okay.   When the United States Patent and Trademark

2  Office -- I'm going to call it the USPTO for short, you're

3  going to hear that a lot -- granted this trademark to

4  plaintiffs for the word Velocity in connection with those

5  goods, did they give a registration number to the goods, to the

6  trademark?

7  A.   Yes.

8  Q.   What is the number?

9  A.   4495336.

10 Q.   Thank you.

11       You testified that from 2004/5 to the present,

12 plaintiffs and their predecessors in interests used the word

13 Velocity in connection with their clothing.   Now we know that

14 plaintiffs have a registered trademark for Velocity for their

15 clothing.

16       Where do plaintiffs sell their clothing?   When I say

17 that, where do they sell their Velocity clothing?

18 A.   We sell to stores like TJ Maxx, Marshalls, Ross stores --

19 they're in West Coast mostly -- Foot Lockers, a lot of

20 mom-and-pop stores, we sell on Amazon, and we have our own

21 website.

22 Q.   Let's take that all one by one.

23       When you sell to all those retailers you mentioned,

24 how are those sales made?

25 A.   We call them, we make appointments, the buyers come to our

 1   showroom.  We are located in 525 Seventh Avenue on 16th floor.

 2   We present them the product that we have produced or we intend

 3   to produce.  Again, they give us a PO, and either we ship what

 4   we have in stock or we produce it accordingly, and then we ship

 5   to them.

 6   Q.  Now, the products that you sell using the name Velocity --

 7   the leggings, capris, yoga pants, sports bras -- do those

 8   products use the word Velocity anymore on the product?

 9   A.  Yes.

10   Q.  Where?

11   A.  Inside of the garment.

12   Q.  Where?

13   A.  In the waistband.

14   Q.  Okay.  For pants.  And if it's not a pair of pants?

15   A.  If it's a tank top, inside right on -- above the neckline

16   as far as the top, obviously following with the care and wash

17   instructions and the size.  We put it back of the garment or

18   logo, which is a V, Velocity circled, that's registered, and

19   also on our hand tags, we put it.

20           And when we ship goods with Amazon or on websites, it

21   comes under the plastic bag which the garment is shipped with.

22   Q.  So if you sell directly to a consumer through Amazon, it

23   comes in a bag?

24   A.  Yes.

25   Q.  The bag says Velocity?

 1   A.  Yes, Velocity.

 2           MR. SOLOMON:  Your Honor, the next collection of

 3   exhibits, I'm going to mark it as one exhibit, it's actually

 4   physical items.  So, it's a little different.

 5           THE COURT:  Okay.  If you think that's going to take

 6   more than a few minutes to go through, maybe this will be a

 7   good place to break for lunch.

 8           MR. SOLOMON:  That's fine, your Honor.

 9           THE COURT:  Okay.

10           So, ladies and gentlemen, we will take our lunch break

11   now.  You should be back in the jury room at 2:00 o'clock.  And

12   just to let you know, today, because of another matter I have

13   at 4:00, we're just going to sit from 2:00 to 4:00, but we will

14   go those two hours without a break.  So, bear that in mind, and

15   we'll see you at 2:00 o'clock.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

```
 1                (Jury not present)

 2                THE COURT:  All right.  Please be back at

 3    2:00 o'clock.

 4                THE WITNESS:  Thank you.

 5                THE COURT:  Anything counsel needs to raise with the

 6    Court?

 7                Yes.  Please be seated.

 8                MR. O'REILLY:  Just to be clear, the witness has been

 9    sworn, so he can't discuss his testimony with counsel going

10    forward?

11                THE COURT:  No, no, no.  He's on direct.

12                MR. O'REILLY:  That's what I wanted to clarify.

13                THE COURT:  No, he's free to talk to counsel as long

14    as he's on direct.  He can't talk to counsel while he's on

15    cross.

16                MR. O'REILLY:  I had a judge say not on direct before,

17    but that's why I wanted to clarify.

18                THE COURT:  Okay.  Very good.  Thanks a lot.

19                MR. O'REILLY:  Thank you, your Honor.

20                (Luncheon recess)

21

22

23

24

25
```

1                          AFTERNOON SESSION

2                               2:10 p.m.

3              MR. O'REILLY:  We had a quick sidebar question --

4              THE COURT:  Come to sidebar.

5              MR. O'REILLY:   -- About the entry of the next set of

6    documents.

7              THE COURT:  Just come to the sidebar.  Let's bring the

8    jury in, and let's bring the witness, as well, on the stand,

9    please.  Counsel can have the sidebar.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. O'REILLY:  Your Honor, we believe that the next

3    set of exhibits are the same issue that we talked about before

4    being they're produced at the last minute, and we think it's

5    fine, but to the extent --

6          THE COURT:  Exhibits from them?

7          MR. O'REILLY:  Yes.

8          MR. SOLOMON:  Our products?

9          MR. O'REILLY:  Yes, your products.

10          MR. SOLOMON:  You never asked for our products, you

11    never made a discovery demand for our products.

12          MR. O'REILLY:  To the extent they were going to use

13    them to support their claims, they have an official disclosure

14    obligation --

15          MR. SOLOMON:  And we disclosed them immediately in the

16    pretrial exchange that we're going to be using our products,

17    and we sent you pictures of them.

18          MR. O'REILLY:  And two days after we gave them our

19    products.

20          MR. SOLOMON:  That's different.  That's very

21    different.

22          MR. O'REILLY:  I don't see it as being at all

23    different.

24          THE COURT:  What's the first one you're introducing?

25          MR. SOLOMON:  The first -- I'm introducing a

1    collection of our clothing; pants, leggings, sports bras that

2    all say Velocity on them.  Their document demands propounded

3    before discovery cutoff didn't ask for any of this.  All they

4    asked for was do you know this person?  Do you know this person

5    using your mark?  Do you know this person using your mark?

6    They never asked all documents you can use at trial.  They

7    didn't ask for evidence introducing the mark.  All the things

8    you would think to ask, they didn't ask for them.  They didn't

9    ask for them at the deposition.  We gave to it them in the

10   pretrial exchange.  We didn't use products, we gave them

11   pictures of them.  Now, we didn't give them the products, we

12   gave them pictures, but they're the same products we have here

13   in pictures.  If you want me to use a picture, I'll use a

14   picture.

15           MR. O'REILLY:  We don't have a problem with the

16   picture.

17           MR. SOLOMON:  You don't have a problem with the

18   picture?

19           MR. O'REILLY:  I don't have a problem with the

20   picture.

21           THE COURT:  Well, number one, I think plaintiff can

22   introduce this.  Number two, I think it makes somewhat more

23   likely that I will allow defense counsel to put in, albeit

24   initially for impeachment purposes, some of the stuff that we

25   were discussing earlier because I think it is, at a minimum,

1   perhaps fairly responsive to these particular exhibits.  So you

2   can go ahead.

3              MR. O'REILLY:  Thank you.

4              MR. SOLOMON:  Thank you, your Honor.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (In open court)

 2                    THE COURT:  Please be seated and let's continue with

 3      the witness.

 4                    MR. SOLOMON:  Thank you, your Honor.

 5      BEHROOZ HEDVAT, resumed

 6      DIRECT EXAMINATION (continued)

 7      BY MR. SOLOMON:

 8      Q.  Mr. Hedvat, before the lunch break, we were about to

 9      discuss the products on which plaintiffs apply the Velocity

10      trademark.  Before I do that, I just have one question for you.

11      Plaintiffs, do they own any other registered trademarks?

12      A.  Yes, we do.

13      Q.  What are those marks?

14      A.  We have registered trademarks of Reflex, 90° Degree, 90°

15      Degree by Reflex, Yogalicious, and Stanwell.

16      Q.  So Velocity is not plaintiffs' only registered trademark,

17      correct?

18      A.  No.

19      Q.  We're going to be talking about Velocity going forward,

20      okay?

21      A.  Yes.

22                    MR. SOLOMON:  I'd like to mark for identification a

23      collection of garments from the plaintiff.  Any objection?

24                    MR. O'REILLY:  No objection.

25                    THE COURT:  Received.  What are you marking them as?
```

```
 1              MR. SOLOMON:  I'm going to be marking these, your

 2    Honor, as Plaintiffs' Collective Exhibit 3.

 3              THE COURT:  Okay.

 4              MR. SOLOMON:  It's just a little hard because they're

 5    actual physical --

 6              THE COURT:  Exhibit 3 is received.

 7              (Plaintiff's Exhibit 3 received in evidence)

 8              MR. SOLOMON:  We're going to be providing opposing

 9    counsel and the Court with pictures corresponding to these

10    garments as well so they have them for the record.

11              Your Honor, I misspoke.  I don't have the physical

12    copy of those pictures, I have pictures of other products, but

13    if opposing counsel --

14              THE COURT:  Just received.

15    BY MR. SOLOMON:

16    Q.  Mr. Hedvat, you have in front of you Plaintiff's Exhibit 3.

17    I want you to go through them and show the jury what it is, and

18    we'll discuss where on those products plaintiffs put the

19    Velocity trademark.  Okay?

20    A.  Yes.  This is one of our fashion leggings.  Their label is

21    right in the waistband, on the hand tag.

22              THE COURT:  I think the only possible way to do this

23    for the transcript is to refer to this as 3A and put a marker

24    on it, and similarly as you go through each one.

25              MR. SOLOMON:  That's very good, your Honor.  Let's do
```

 1    that.  I'm going to bring up stickers right now.

 2            THE WITNESS:  Shall I continue?

 3            MR. SOLOMON:  Can I publish the picture of these to

 4    the jury, as well?

 5            THE COURT:  Yes, go ahead.

 6    BY MR. SOLOMON:

 7    Q.  We're going to mark this one as 3A.  I'll put it on the

 8    tag.

 9    A.  This is another one of our leggings which is a high-waisted

10    cotton one.  The label Velocity again is inside the waistband.

11    The logo, the V is in the back and the hand tag, and the actual

12    instruction is hanging on the garment.

13    Q.  So the label Velocity is inside the pants and on the hand

14    tag?

15    A.  Inside the pants and on the hand tag and in the back of the

16    garment.

17    Q.  Okay.

18            MR. SOLOMON:  Your Honor, just to make it faster, may

19    I stand near the witness to apply the labels so I'm not going

20    back and forth?

21            THE COURT:  Yes.

22            MR. SOLOMON:  Thank you.

23            THE WITNESS:  This is one of our seamless bras.  The

24    label again is inside the garment.  The logo is in the back.

25    The hand tag is torn off, but usually has a hand tag so you can

 1   put it inside.

 2          This one is another one of our sport bras.  The label

 3   is inside.  The logo is in the back, as always, and a hand tag.

 4   Q.  That's 3D.  Okay.  Let's do this.

 5   A.  Again, under Velocity, we do both sizes, misses sizes and

 6   plus sizes.  This happens to be a plus size V-neck top.  The

 7   label is inside the garment, Velocity is on the packaging.

 8   Should I open it?

 9   Q.  No, that's okay.

10   A.  This is one of our running shorts.  We call it a twofer.

11   It comes with Spandex legging or short inside.  It has our

12   label inside with the logo and a hand tag attached.

13   Q.  The hand tag says Velocity?

14   A.  Velocity.  Hand tag says Velocity, and the wicking

15   technology, and all of the other description.

16   Q.  Okay.  The shorts will be 3F.

17   A.  Again, this is one of our fashion leggings.  The Velocity

18   stamped inside.  The logo stamped in the back.  The Velocity

19   hand tag attached.

20          This is one of our short-sleeved sport tops.  The

21   label is inside of the garment.  The logo also on this one is

22   inside, and the Velocity is on the packaging when we ship it.

23   Q.  That will be 3G.  We don't need to do another one.

24   A.  Okay.

25   Q.  A couple of those products that we just saw are in bags.

 1  Is that how the products are delivered to consumers?

 2  A.   Yes.

 3  Q.   When I say that, I mean when they're ordered online or when

 4  they buy them in the store.

 5  A.   Well, we ship all of products just like this.  Stores take

 6  it out of the bag and hang it.  When we ship it -- obviously,

 7  through internet it goes like that to the consumer.  We ship it

 8  like that.

 9  Q.   How much do the Velocity products, the leggings, the

10  capris, the sports bras, the yoga pants, how much do they sell

11  for?  And when I mean sell for, I mean not how much do you sell

12  them to TJMaxx, how much do they retail for to consumers,

13  whether they're direct from the internet or whether they're at

14  TJMaxx?

15  A.   Depending on the product, it sells anywhere from $7.99 to

16  $39.99.

17  Q.   And who is the target audience?  Who is plaintiffs' target

18  audience for the Velocity brand of products?

19  A.   You mean the age?

20  Q.   Whatever it is; men, women, age, whatever it is.

21  A.   We only do women.  Our target audience is from 23 to 45.

22  Q.   You mentioned that individuals can buy Velocity products

23  directly online, and that you also sell them to a showroom,

24  right?

25  A.   We sell it through a showroom, yes.

 1   Q.   Where is your showroom?

 2   A.   525 7th Avenue, Room 1601 in Manhattan.

 3           MR. SOLOMON:  I'd like to mark for identification

 4   Plaintiff's Exhibit 4, which is a collection, but it's a

 5   collection of pictures.

 6           MR. O'REILLY:  Your Honor, we don't object to this,

 7   but it raises the same issues we discussed before.

 8           THE COURT:  The one we discussed at the sidebar?

 9           MR. O'REILLY:  Yes.

10           THE COURT:  Yes.  So it's the same ruling.

11           MR. SOLOMON:  Thank you, your Honor.

12           Your Honor, may I approach?

13           THE COURT:  Yes.

14           MR. SOLOMON:  These are admitted into evidence,

15   correct?

16           THE COURT:  Plaintiff's Exhibit 4 is received.

17           (Plaintiff's Exhibit 4 received in evidence)

18           MR. SOLOMON:  Thank you, your Honor.  Publish it to

19   the jury.

20   BY MR. SOLOMON:

21   Q.   Mr. Hedvat, we're going to present you a collection of

22   pictures one by one.  This first picture, what are we looking

23   at?

24   A.   This is our showroom in 525 7th Avenue, and that's my

25   brother Leon sitting with the customer.

1   Q.  Let's go to the next page.  What are we looking at in this

2   page?

3   A.  This is the door to the showroom with our Velocity name on

4   the showroom.

5   Q.  Let's go to the next page of the exhibit, if we could.

6   What are we looking at in this picture?

7   A.  The collection of some of our Velocity products that I took

8   a picture.

9   Q.  This is in your showroom?

10   A.  Yes, it's in the showroom.

11   Q.  Go to the next page.

12   A.  Again, this is the door to the showroom opened up.  There

13   were some products hanging so I took a picture with the door

14   and the product.

15   Q.  Thank you.  Who comes to the showroom?

16   A.  Me and my brothers, the people who work for us, the

17   customer.

18   Q.  Let's me ask a different question.

19   A.  I'm sorry.

20   Q.  What is the purpose of the showroom?

21   A.  To present our product and to sell.

22   Q.  To whom are you selling to in the showroom; consumers or

23   retailers?

24   A.  Retailers.

25   Q.  What retailers come to the showroom to buy Velocity branded

 1    leggings, yoga pants, capris, and sports bras?

 2    A.   Footlocker, TJMaxx, Marshals, Burlington, Ross stores,

 3    Dick's Sporting Goods, and a lot of mama papa stores.

 4            MR. SOLOMON:  I'd like to mark at this time for

 5    identification Plaintiff's Exhibit 3 -- I'm sorry --

 6    Plaintiff's Exhibit 5.

 7            MR. O'REILLY:  Your Honor, this bears the same issue,

 8    and I'm not going to raise that again.  I would assume that's

 9    what you prefer, right?

10            THE COURT:  Yes.  The objection raised at the sidebar

11    is preserved for this exhibit as well, and the same ruling

12    applies.

13            MR. O'REILLY:  Thank you, your Honor.

14            MR. SOLOMON:  May I approach?

15            THE COURT:  Yes.  Exhibit 5 is received.

16            (Plaintiff's Exhibit 5 received in evidence)

17    BY MR. SOLOMON:

18    Q.   Mr. Hedvat, you have in front of you Plaintiff's Exhibit 5.

19    What is this?

20    A.   This is one of our look books.

21    Q.   It's a look book, you said?

22    A.   Yes.

23    Q.   What is a look book?

24    A.   We put our product on a model and we make -- put our latest

25    products on it, and we hand it to our customers who come to the

1   showroom for current -- for immediate reference or for future

2   reference.

3   Q.  Can we go through some of the pages of the look book?  The

4   first page of the look book, what's on the front cover?

5   A.  It's one of our sports bras and one of our leggings.

6   Q.  I think you skipped to the second page.  What's on the

7   first page?

8   A.  The first page is the cover of our look book which

9   indicates our Velocity label with our Velocity logo.

10  Q.  Let's go to the second page.  What are we looking at here?

11  A.  Second page is one of our sport tank tops and legging.

12  Q.  When you say "one of our sports tops and leggings", is it a

13  Velocity product?

14  A.  Yes, our Velocity product.

15  Q.  Are all of these -- and we'll go through it a little

16  faster -- are these all Velocity products?

17  A.  Yes.

18  Q.  Let's show the jury.  Mr. Hedvat, let's discuss on each

19  page.  Velocity product on page 2?

20  A.  Yes.  This is one of our tank tops.

21  Q.  Okay.  Page 3?

22  A.  Bra top, I think -- yeah.

23  Q.  Page 4?

24  A.  Is another bra top with the -- the bra is Velocity.

25  Q.  The word "Velocity" would be where on this product?

1   A.  On the back of the sports bra.  The word "Velocity" is

2   inside the bra and the logo is on the back.  That's how usually

3   we do it.

4   Q.  Next page, same thing?

5   A.  Same thing.  A bra and a legging, Velocity.

6   Q.  Next page, same thing?

7   A.  Yes.  One of our fashion leggings.

8   Q.  Next page?

9   A.  One of our fashion leggings, Velocity label.

10  Q.  Next page?

11  A.  Same thing, one of our Velocity fashion leggings.

12  Q.  Okay.

13  A.  Next page, and on and on.

14  Q.  In 2016, about how many Velocity products did plaintiffs

15  sell?

16  A.  I'm sorry?

17  Q.  In 2016, approximately how many Velocity products did

18  plaintiffs sell?

19  A.  2016?  About 3 million pieces.

20  Q.  3 million pieces in 2016.  How much in gross sales, meaning

21  not costs included, just if you were to take those sales and

22  tie them to the number of the price you sell them to customers

23  at, how much would these sales be in 2016 for Velocity products

24  only?

25  A.  About $40 million.

1   Q.  That's plaintiffs' sales of just Velocity products?

2   A.  Just Velocity, yes.

3   Q.  All of plaintiffs' products, if we took all the plaintiffs'

4   products, including all those other trademarks you mentioned --

5   A.  90° Degree.

6   Q.  -- 90° Degree, Reflex, all the other trademarks you

7   mentioned, how much would plaintiffs' sales have been in 2016?

8   A.  Over 200 million.

9   Q.  That's for all of the products?

10  A.  For all the products.

11  Q.  For just Velocity, 2016, it's 40 million in sales?

12  A.  About.

13  Q.  How much does it cost plaintiffs to make that many

14  products?  How much does it cost plaintiffs to do that?

15  A.  On Velocity?

16  Q.  Mm-hmm.

17  A.  Usually make 20 percent profit.

18  Q.  So you make a 20 percent profit on the 40 million?

19  A.  Yes.

20  Q.  So about 32 --

21  A.  Cost is around 32 million.  Just about.

22  Q.  Just for Velocity.

23  A.  Just for Velocity.

24  Q.  When you make these products, how is it that you make the

25  products?

1  A.  Where I make them?

2  Q.  How does it come to be that a product, a sports bra or a

3  legging, gets manufactured for Velocity?

4  A.  We have our designer, we ask them that, obviously, on a

5  request of a customer or on a request of the principals of the

6  company, where the market is, to give us sketches of bra, and

7  obviously, what's in demand in the market.  So they do the

8  design, we take the design, we send it to our factories, we

9  make sample, sample comes, we feed the samples few times until

10  it's perfect, and the factory, we nominate fabrics, trims,

11  sewing factories, and the finished products comes to our

12  warehouses.

13  Q.  When plaintiffs order the products from the manufacturer,

14  is there a document that's used to order the products?

15  A.  Yes.

16  Q.  What's that called?

17  A.  Purchase order -- I'm sorry, I'm sorry -- yes, purchase

18  order to the factory, right.

19  Q.  And when plaintiffs then sell their products to a retailer,

20  like TJMaxx or Ross stores, through what document do they bill

21  the customer?  What's that called?

22  A.  Invoice.

23        MR. SOLOMON:  I'm going to mark for identification at

24  this time Plaintiff's Exhibit 6.  I said I'd like to mark

25  Plaintiff's Exhibit 6 for identification.

```
 1              MR. O'REILLY:  If you're offering it, I don't have any
 2   objection.
 3              MR. SOLOMON:  Your Honor, may I approach with
 4   Plaintiff's Exhibit 6?
 5              THE COURT:  Yes.
 6              MR. SOLOMON:  Is Plaintiff's Exhibit 6 in evidence,
 7   your Honor?
 8              THE COURT:  Is there any objection?
 9              MR. O'REILLY:  No, your Honor.
10              THE COURT:  Received.
11              (Plaintiff's Exhibit 6 received in evidence)
12              MR. SOLOMON:  Thank you.
13   BY MR. SOLOMON:
14   Q.  Mr. Hedvat, you have in front of you Plaintiff's Exhibit 6.
15   It's a long document.  Can you explain to us what we're looking
16   at?
17   A.  This is a summary of invoices that we've shipped the
18   customers, and it just shows the invoice, invoice number, and
19   the PO number from the customer.
20   Q.  Let's break it down.  We're not going to go through the
21   whole exhibit because it's 188 pages, but let's break down one
22   or two.
23              This exhibit, this chart, what year is this chart
24   talking about?
25   A.  2015.
```

1   Q.  So let's look at the first -- really, the second column.

2   There is the date on the top left, then we have the middle.

3   What does the middle say?

4   A.  Description of the garment.

5   Q.  How do we know this is a Velocity garment?

6   A.  Usually we put the first abbreviation of what the garment

7   is.  LS is long sleeve, v is Velocity, and the style number.

8   Q.  Okay.

9   A.  That mostly, but there's few exceptions, but mostly that's

10  how is noted.

11  Q.  Let's go down to item on line 7 -- I'm sorry -- item

12  line 8.  It doesn't say LS, it says something different.  What

13  is it saying?  What does PV768 mean?

14  A.  PV is pants Velocity.  So pants and legging is the same

15  thing.  We couldn't put L because L is used for long sleeve, so

16  P is for pants.

17  Q.  Got it.  Let's go back to the top.

18              Name.  See how it says name in Column F?  What is that

19  name referring to?

20  A.  Name of the customer.

21  Q.  Line No. 2 is Backcountry.com, Inc., right?  That's the

22  customer that this invoice was sold to?

23  A.  Yes.  Probably internet company that they buy from us and

24  they sell it on their own.  Okay?  So let's say if you want to

25  go down to TJXUK, that's TJMaxx England.

1    Q.   What number?

2    A.   That's number 14.  So that's TJMaxx England that we sell

3    the goods to.  The invoice number.  The quantity on the price

4    that they pay.

5    Q.   The column to the right of the name of the retailer is the

6    quantity they purchased --

7    A.   The quantity that they purchased.

8    Q.   -- in that particular purchase order?

9    A.   In that particular and --

10   Q.   Let me ask a particular question.  In that particular

11   invoice?

12   A.   Yes.

13   Q.   To the right is the price that company paid you?

14   A.   That they paid, yes.

15   Q.   Let's go down.  We see Ross stores.  We see TJXUK.  What

16   else?

17   A.   Yes.  TJXUK, that's Ross stores.  So Ross stores, they

18   bought the pants Velocity.  Is probably solid black pants.

19   They bought 1,200 at $7.50.

20   Q.   Let's keep going through a couple.

21   A.   So it keeps on going.  Next page, again, Ross stores,

22   TJMaxx UK.  Ross stores again.

23   Q.   So the first line on page 2, line 18 they bought 1,464

24   pieces in that one particular order.

25   A.   Yes.

1    Q.  Let's keep going down.  You said Ross stores.  Those are

2    orders for Ross stores on lines 34, 36, and 37?  Is that what

3    we're looking at?

4    A.  Yes.

5    Q.  Let's keep going down.  Let's go down.  Let's go down.

6    Let's go to page 50.

7    A.  50.

8    Q.  50.  5-0.  Let's stop.  Look at line 916, for example.  Who

9    is the company that purchased those goods?

10   A.  Burlington Coat Factory.

11   Q.  How many did they purchase in the order that generated

12   invoice referenced in line 916?

13   A.  1,760 pieces.

14   Q.  Let's go down to line 919.  How many pieces did Burlington

15   purchase in that one particular order?

16   A.  3,120 pieces.

17   Q.  Let's go to line 922.  How many pieces did Burlington

18   purchase in that particular order?

19   A.  4,002 pieces.

20          MR. SOLOMON:  I'd like to marked for identification

21   Plaintiff's Exhibit 7, which is the actual --

22          Your Honor, we'd like to offer Plaintiff's Exhibit 7

23   for identification.

24          MR. O'REILLY:  No objections, your Honor.

25          THE COURT:  Received.

1                 (Plaintiff's Exhibit 7 received in evidence)

2                 MR. SOLOMON:  Thank you.  May I approach?

3     BY MR. SOLOMON:

4     Q.  Mr. Hedvat, you have in front of you Plaintiff's Exhibit 7.

5                 MR. SOLOMON:  By the way, may I move Plaintiff's

6     Exhibit 7 into evidence?  Your Honor, may I move Plaintiff's

7     Exhibit 7 into evidence?

8                 THE COURT:  It's already been received.

9                 MR. SOLOMON:  I'm sorry, your Honor.

10    BY MR. SOLOMON:

11    Q.  Mr. Hedvat, you have in front of you a collection of

12    documents.  What are these documents?

13    A.  Invoices.

14    Q.  For what year is this collection of invoices?

15    A.  2016.

16    Q.  I'm not going to go through all of them because, again,

17    there's a lot of them, but let's explain to the jury a little

18    bit about what we're looking at here.  What is this document

19    for?

20    A.  This is for the goods shipped to A&E stores.  A&E stores

21    are known as Strawberries in New York City.  They bought some,

22    obviously from the style numbers, some leggings, and we

23    invoiced them accordingly.

24    Q.  Let's go in one, two -- let's go to the third page.  Who is

25    this an invoice to?

1   A.   This is the invoice to store called DDs.  DDs is affiliated

2   with Ross stores.  Again, they bought some goods that we

3   shipped them and we invoiced accordingly.

4   Q.   Velocity goods or a different kind of goods?

5   A.   Velocity goods.

6   Q.   Let's go to the next page.  Who is this an invoice to?

7   A.   DDs, same.  Same customer.  Velocity goods.

8   Q.   Turning a few pages, let's see if we can find a different

9   retailer.

10  A.   So obviously, the page after that is Ross stores.  That's

11  the main store.

12  Q.   Okay.

13  A.   Next that is a store called Retail Therapy, LLC.  They

14  bought some goods.  The page after that, which is invoice

15  18853, is Ross -- I apologize -- Burlington.  They bought 2,868

16  of French terry pants, fleeced inside.  Something that we do in

17  plus size.

18  Q.   Each invoice represents only one particular order that it

19  made for these Velocity goods, not all the orders they made.

20  A.   No.  Each one is designated their own order number.

21  Accordingly, we invoice, we put that order number, and that's

22  how they process to pay us.

23          MR. SOLOMON:  I'd like to mark Plaintiff's Exhibit 8

24  for identification.

25          MR. O'REILLY:  No objection.

1          THE COURT:  Received.

2          (Plaintiff's Exhibit 8 received in evidence)

3          MR. SOLOMON:  Thank you, your Honor.  May I approach?

4          THE COURT:  Yes.

5          MR. SOLOMON:  May we publish this to the jury, your

6    Honor?

7          THE COURT:  Yes.

8          MR. SOLOMON:  Thank you.

9    BY MR. SOLOMON:

10   Q.  Mr. Hedvat, you have in front of you another collection of

11   documents.  What are these documents?

12   A.  These are purchase orders that we create to the factories

13   that they do production for us, and it shows the style number,

14   description, quantity, and the price that we pay the factory.

15   Q.  Let's just go through a few of the items on here.  These

16   are the Velocity products?

17   A.  Yes.

18   Q.  When we look to the columns, one, two, the third column

19   over, QTY stands for?

20   A.  Third column over.  On the first page?

21   Q.  Yes.

22   A.  PVX, you mean?

23   Q.  No.  You see "item", you see "description", and a third

24   column "QTY"?

25   A.  I apologize.  Quantity.

1   Q.   Okay.  So in this particular order, this is order -- first

2   page is order number 1308.  How many Velocity products were

3   ordered here?

4   A.   9,000.

5   Q.   9,000.  That's just for one purchase order.

6   A.   One purchase order.

7   Q.   For what year is this collection discussing?

8   A.   2016.

9   Q.   Okay.  And so 2015 is in there, as well, correct?

10  A.   Yes.

11  Q.   When plaintiffs purchase Velocity products from their

12  manufacturers, in what quantity are the orders made?  Are they

13  a couple dozen, a couple hundred, couple thousand, typically?

14  A.   Right.  We place the order to do production on our

15  instruction.  We don't buy their goods.  This is our product,

16  this is our original designs, our fabrication, and whatever we

17  do we nominate them.  So average quantity could be 10,000,

18  could be 50,000.

19  Q.   But the purchases are made in the thousands?

20  A.   Thousands, of course.

21        MR. SOLOMON:  I'd like to mark for identification

22  Plaintiff's Exhibit 9.  I'd like to offer Plaintiff's Exhibit 9

23  into evidence, your Honor.

24        MR. O'REILLY:  One second, your Honor.  I'd like to

25  take a look at it.  No objection, your Honor.

1          THE COURT:  Received.

2          (Plaintiff's Exhibit 9 received in evidence)

3          MR. SOLOMON:  Thank you, your Honor.  May I approach?

4          THE COURT:  Yes.

5          MR. SOLOMON:  May I publish to the jury?

6          THE COURT:  Yes.

7          MR. SOLOMON:  Thank you.

8  BY MR. SOLOMON:

9  Q.  Mr. Hedvat, you have in front of you Plaintiff's Exhibit 9.

10  You testified earlier that plaintiffs advertise or spend money

11  to advertise their products, their Velocity products.  What are

12  we looking at in Plaintiff's Exhibit 9?

13  A.  This is credit card charges that -- part of this is proof

14  that we advertise on Google and Amazon our Velocity product.

15  Q.  On the top left, if you go to the first page, whose name is

16  that on the top left?

17  A.  That's my younger brother.

18  Q.  He's in the company, he's one of the brothers you

19  referenced earlier?

20  A.  Yes.

21  Q.  When you say you pay to advertise on Google or on Amazon,

22  what do you mean?  What are you paying for?

23  A.  We paying for if people Google any of our -- any of the

24  products that we do, obviously pops out and gives them a choice

25  where to go and directs them to our product.

1   Q.  We see entries for sponsored products.  What does that

2   mean?

3   A.  Sponsored product are -- again, is the Velocity, that we on

4   timely basis, we give that promotional price to customers, and

5   we ask for the review, and obviously, we use those reviews to

6   improve our product.

7   Q.  So just so I understand, you mean you give the products

8   away?

9   A.  Yes.

10  Q.  How many products do plaintiffs give away typically to help

11  advertise the Velocity name?

12  A.  Depends on the actual product.  If it's brand new, we do

13  more.  If it's something that we keep running, we do less.  But

14  we just do it on the purpose of getting the feedback faster

15  than our other customers so we can improve on it, if any.

16  Q.  You've mentioned you advertise on Google and Amazon, you

17  mentioned you give away products.  What else do plaintiffs do

18  to get their name out there, the Velocity name specifically?

19  A.  We put our name on the products that we ship to the

20  consumer so that we hoping that that would carry.  But mostly,

21  our advertising is our own product that speaks for itself for

22  the quality, for the repeat customers, and friend telling

23  friend to go and buy Velocity because of the good quality that

24  we stand behind.

25  Q.  That's for end users or consumers, but what about for the

1    retailers?  What do you do to draw the retailers to the

2    showroom or show the product at the showroom?

3    A.  We send look books and make an appointment for them to look

4    at the product.

5    Q.  Doesn't hurt to have a showroom in Manhattan, either,

6    right?

7    A.  We do have a showroom in Manhattan.  A nice one.

8    Q.  Did there come a time when you discovered defendants began

9    using -- before I get there, let me just clean one thing up.

10         You mentioned earlier that Plaintiffs 4 Pillar Dynasty

11   owned the trademark, and Plaintiffs Reflex licensed the

12   trademark, right?

13   A.  Yes.

14         MR. SOLOMON:  I'd like to mark as Plaintiff's

15   Exhibit 10 for identification, if I could.

16         MR. O'REILLY:  No objection, your Honor.

17         THE COURT:  Received.

18         (Plaintiff's Exhibit 10 received in evidence)

19         MR. SOLOMON:  Thank you, your Honor.  May I approach?

20         THE COURT:  Yes.

21         MR. SOLOMON:  Thank you.  May I publish to the jury,

22   your Honor?

23         THE COURT:  Yes.

24         MR. SOLOMON:  Thank you.

25

1   BY MR. SOLOMON:

2   Q.  Mr. Hedvat, what are we looking at in Plaintiff's

3   Exhibit 10?

4   A.  This is the trademark license agreement between 4 Pillar

5   Dynasty and Reflex Performance Resources on our Velocity name.

6   Q.  Let's go down to paragraph 1.1.  Is that where it

7   references Velocity?

8   A.  Yes.

9   Q.  Thank you.  Now, did there come a time when you discovered

10  defendants were using the Velocity mark to sell leggings,

11  capris, yoga pants, and tank tops?

12  A.  Yes.

13  Q.  How did you come to learn that?

14  A.  A buyer came to my office and asked me if 4 Pillar Dynasty

15  licensed the name to New York & Company.

16  Q.  What did you do after hearing that?

17  A.  I said "no".

18  Q.  Anything else?  Were you surprised?

19  A.  I was extremely surprised.  And after he left, we went on

20  the website, and sure enough, it was there.  Big letters.

21  Q.  You say you went on the website.  Whose website did you go

22  on?

23  A.  New York & Company.

24  Q.  When about was this, what time period?  2015, 2016?

25  A.  2015, I believe.

1   Q.  Just so I'm clear, you said you found out about defendants'

2   use of the word "Velocity" from a buyer in your showroom?

3   A.  Yes.

4   Q.  He asked you if there was -- withdrawn.

5        Then after he spoke to you, you went on

6   New York & Company's website.

7   A.  Actually, we went New York & Company Velocity and the

8   website popped up.

9   Q.  Then you went on the website?

10  A.  Yes.

11       MR. SOLOMON:  I'd like to mark this for

12  identification.

13       MR. O'REILLY:  No objection, your Honor.

14       THE COURT:  Received.

15       (Plaintiff's Exhibit 11 received in evidence)

16       MR. SOLOMON:  Thank you, your Honor.  May I approach?

17       THE COURT:  Yes.

18       MR. SOLOMON:  Could we publish to the jury, your

19  Honor?

20       THE COURT:  Yes.

21  BY MR. SOLOMON:

22  Q.  Mr. Hedvat, you have in front of you Plaintiff's

23  Exhibit 11.  Is this what you saw after the buyer asked you

24  about the relationship between your company and Velocity?

25  A.  Yes.

1   Q.  What are we looking at?

2   A.  We're looking at the front page website advertising

3   Velocity with the new active wear collection.

4   Q.  This is New York & Company's website?

5   A.  Yes.

6   Q.  Not yours?

7   A.  Not mine.

8   Q.  It says the word -- let's read it.  Underneath the models,

9   let's go down.  Can you read the words that are on the website?

10  A.  Starting from "meet Lauren"?

11  Q.  No, below that.

12  A.  Oh, okay.  "Introducing the new active collection."

13  Q.  Keep going.

14  A.  "New York & C Velocity is designed with stretch to mold

15  with you, wicking to keep you dry, and you feel amped and look

16  fit and fab even before you hit the gym."

17  Q.  Okay.  Zoom back.

18  A.  And it's --

19  Q.  Can you describe -- withdrawn.

20          Do you believe New York & Company is using the

21  Velocity -- your Velocity trademark here?

22  A.  Do I believe if they're using it?

23  Q.  Yes.

24  A.  Yes.

25  Q.  Are the products on the models above the words,

1    "Introducing the new active collection," on those ladies, are

2    those the same type of products that plaintiffs sell using the

3    Velocity name?

4    A.    Exact.

5    Q.    Is this the only place on New York & Company's website that

6    defendants were using the Velocity mark?

7    A.    On the website?

8    Q.    Yes.

9    A.    Yes.

10   Q.    Were there other places they were using it?

11   A.    Well, the website goes on and on and on and on to show

12   different products of Velocity, but this is the front page.

13   Q.    Do you know if New York & Company was using Velocity to

14   identify goods themselves, as well?

15   A.    I'm sorry?

16   Q.    Was New York & Company, in addition to calling the new

17   active collection Velocity, were they also using the word

18   "Velocity" to identify particular goods themselves?

19   A.    In the stores.

20   Q.    Online, were they using the word "Velocity" to identify

21   products, as well?

22   A.    Yes.

23   Q.    Having seen this, which I believe you said was in 2016, I

24   don't remember what time of year -- do you recall what time of

25   year this was in 2016 when you saw this?

 1   A.  No.

 2   Q.  What did you do next?

 3   A.  I called by lawyers --

 4   Q.  Did you do anything else?

 5   A.  -- and that's you, fortunately.

 6   Q.  Did you ask our firm to request the defendants stop using

 7   the Velocity mark?

 8   A.  Yes.

 9   Q.  Did they?

10   A.  Yes, they asked.

11   Q.  Did defendants stop?

12   A.  No.

13   Q.  Have you personally seen some of the clothing that

14   defendants used the Velocity name on?

15   A.  Yes.  I purchased it myself.

16   Q.  Can you describe the quality of the product as compared to

17   your Velocity products?

18   A.  It's a hard question.  If you hold it up one by one, it

19   looks the same.  But as far as all my experience of these 20

20   years and odd years, their product looks inferior to my

21   product.

22   Q.  Why do you say that?

23   A.  The fabrication, the sewing, the stitching.  They -- most

24   stuff their products is poly Spandex.  Not that I don't use

25   poly Spandex, but we use nylon Spandex, as well.  I don't know

1    if the terminology means anything.  We use five blocks, six

2    blocks machines.  Most stuff their stuff is cut and sewn.

3    Q.  Let's not get too technical, but what did you just say?

4    A.  What happens when it comes to products like this, you have

5    to have machineries that it could take lots of stretch and lots

6    of exercise without tearing on the seams and stuff.  Those are

7    special machines, very expensive machines, and that's what we

8    use all the time to produce Velocity product.

9    Q.  You believe that defendants don't use those kind of

10   machines?

11   A.  If they do on some, I don't know about the products I saw,

12   they don't.

13   Q.  Any other differences?

14   A.  Looks extremely similar to me as far as the hand tag and

15   the label.

16   Q.  Mr. Hedvat, do you believe that plaintiffs' use of the

17   Velocity mark, do you believe the Velocity mark is a strong

18   mark?

19   A.  Yes.

20   Q.  Why?

21   A.  Well, in my business, my customers refer to Velocity for

22   good quality, for using it over and over and over again.  And

23   obviously, at this time of point, is not only for exercise, you

24   could go to movies with it, you could go to supermarket with

25   it, you could even sleep with it, and that's how strong of a

1   segment in the garment district these products are.

2   Q.  In your mind and what you believe are in the mind of

3   consumers, do people when they see the Velocity word, do they

4   identify it with your products?

5   A.  Yes.

6   Q.  Does the word "Velocity" refer to the products themselves,

7   refer to the quality of the products?

8   A.  That's what it is.  Most these referred -- as far as

9   Velocity, I know it comes to your mind that it's for active and

10   it's for performance and for stretch, but my consumers refer --

11   they see Velocity as quality.

12   Q.  How did it come to be that your consumers associate the

13   Velocity mark with your products and the quality?

14   A.  From our growth over years and years that we started with

15   zero and, thank God, we are over $40 million a year right now.

16   Q.  You say you sell to TJMaxx and Ross stores and Burlington

17   the Velocity products.  By doing that, how many stores do you

18   think your products are in?

19   A.  TJMaxx, Marshals, Ross stores, and Burlington, they got

20   close to 10,000 stores.

21   Q.  Do you believe defendants' use of the word "Velocity" in

22   connection with their sale of leggings, capris, sports bras,

23   and yoga pants is similar to yours?

24   A.  Yes.

25          (Continued on next page)

1   BY MR. SOLOMON:

2   Q.  Why do you believe their use of the word "Velocity" is

3   similar to your use of the word Velocity?

4   A.  Exactly the same funds, the same word, the same everything.

5              THE COURT:  Counsel, approach the sidebar.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  Now, because this is an adversary system,

3      the Court will not intervene absent very unusual circumstances.

4      So I just want to note for the record that the last at least

5      ten questions have been blatantly improper under any

6      conceivable view of the rules of evidence, but that defense

7      counsel, who is apparently of the potted-plant school of

8      defense counsel, has chosen not to object.

9              MR. O'REILLY:  I'd just like to say, your Honor, I

10     understand and -- I understand your objection, the purpose, but

11     I didn't --

12             THE COURT:  For instance, the last question was an

13     invitation to the witness to speculate about someone else's

14     state of mind.  So it doesn't pass the speculation test, it

15     doesn't pass the relevancy test, it doesn't pass virtually any

16     test, but there was no objection.  Now, of course, plaintiff,

17     by asking those questions, may open doors that defendants will

18     then feel free to walk in, and plaintiff will have no recourse

19     under those circumstances.

20             Given the last few questions, it's hard for me to

21     imagine any question that defense counsel could put to this

22     witness that plaintiff would be able to object to.  But it's an

23     adversary system.  I'm just having fun listening.

24             MR. O'REILLY:  I'm having fun, too, your Honor.

25             (Continued on next page)

1                    (In open court)

2    BY MR. SOLOMON:

3    Q.  Mr. Hedvat, can you describe whether the customers of the

4    defendants are in any way similar to the customers plaintiffs

5    are targeting?

6    A.  If they are the same?

7    Q.  If they are or they're not.

8    A.  Yes, they are.

9    Q.  Why do you believe that?

10   A.  I believe the products is extremely similar, and we cater

11   to the same demographics as far as age and pretty much sell to

12   the same customers.

13   Q.  Do you know how much defendants sell their Velocity

14   collection of leggings, capris, sports bras, and yoga pants?

15   How much do they sell for retail?

16   A.  I believe -- depending on the garment, I think it's $39 for

17   legging.

18   Q.  Is it a similar price to yours, or do they have a very

19   different price to yours?

20   A.  Pretty much similar.

21              MR. SOLOMON:  Your Honor, if I may take five minutes

22   just to make sure I have nothing further for the witness?

23              THE COURT:  You want five minutes?

24              MR. SOLOMON:  Two minutes, just to make sure I have

25   nothing else for him.

```
 1              THE COURT:  All right.  We'll give the jury a very
 2    quick break.  No more than five minutes, ladies and gentlemen.
 3    So you can go back to the jury room, but we're going to call
 4    you back in five minutes.  Thank you very much.
 5              MR. SOLOMON:  Thank you, your Honor.
 6              (Jury not present)
 7              THE COURT:  Okay.  We'll see you in five minutes.
 8              MR. SOLOMON:  Thank you, your Honor.
 9              (Recess)
10              (Jury present)
11              THE COURT:  All right, Counsel.
12              MR. SOLOMON:  Thank you, your Honor.
13              We have one more exhibit to offer on plaintiffs'
14    direct.
15              THE COURT:  Okay.
16              MR. SOLOMON:  It's marked for identification as
17    Plaintiffs' Exhibit 12, I believe we're up to.  I'd like to
18    offer Plaintiffs' Exhibit 12 into evidence, your Honor.
19              MR. O'REILLY:  No objection, your Honor.
20              THE COURT:  Received.
21              (Plaintiffs' Exhibit 12 received in evidence)
22              MR. SOLOMON:  May I approach, your Honor?
23              THE COURT:  Yes.
24              MR. SOLOMON:  May we publish Plaintiffs' 12 to the
25    jury?  Thank you, your Honor.
```

1    BY MR. SOLOMON:

2    Q.  Mr. Hedvat, you have in front of you a collection of

3    documents.  Let's stick with the first page for now because

4    there are a lot of them, and we're not going to go through all

5    of it.

6           On the top right -- let's go up to the top right.

7    There's a black square with a date in front of it.  Can you

8    read the date, please?

9    A.  July 22nd, 2015.

10   Q.  Okay.  This is a capture from the Internet archive of New

11   York & Company's website that was captured on that day.  Can

12   you see -- is the word -- is your Velocity mark anywhere on

13   this page?

14   A.  Yes.

15   Q.  Where is it?

16   A.  Under the letters "All Active," right underneath says, "New

17   York & Company Velocity."

18   Q.  Okay.  And you contend that's defendants' use of your word

19   mark?

20   A.  Yes.

21   Q.  Let's go to page 2.  What are we seeing on page 2?

22   A.  Indicating New York & C Velocity leggings.

23   Q.  Whose website are we looking at?

24   A.  New York & Company.

25   Q.  You see defendant using your word mark Velocity on this

1   page?

2   A.   Yes, several places.

3   Q.   Where do you see them using your mark?

4   A.   Again, on top, New York & Company Velocity.

5   Q.   Okay.

6   A.   On the places that they give you choices, New York &

7   Company Velocity.

8   Q.   Okay.

9   A.   And underneath each legging offering, New York & Company

10  Velocity.

11  Q.   The products here, what would you call the products that

12  New York & Company is selling on this page?

13  A.   Capris and leggings.  Print capris.

14  Q.   Can a consumer purchase them from New York & Company's

15  website?

16  A.   Yes.  And in the stores.

17  Q.   Are these the same types of products plaintiffs sell with

18  their Velocity word mark?

19  A.   Yes.

20  Q.   Let's turn to page 5, if we could, of Plaintiffs' 12.  And

21  zoom back.

22  A.   Yes.

23  Q.   What are we seeing on page 5 of Plaintiffs' Exhibit 12?

24  A.   Introducing the new active collection, New York & Co.

25  Velocity, with a capri and a sports bra.

1   Q.  Let's go to the top right.  Do you see a black box?

2   A.  Yes.

3   Q.  What date is there?

4   A.  August 21st, 2015.

5   Q.  This is a capture of the Defendants' website on that day?

6   A.  Yes.

7   Q.  And you see your word mark on this page as well?

8   A.  Yes.

9        MR. SOLOMON:  I have nothing further for this witness

10  at this time, your Honor.

11       THE COURT:  All right.

12       Cross-examination.

13  CROSS-EXAMINATION

14  BY MR. O'REILLY:

15  Q.  Good afternoon, Mr. Hedvat.

16  A.  Good afternoon.

17  Q.  You testified about a buyer coming into your showroom and

18  mentioning that they thought that you entered into a license

19  agreement with New York & Company?

20  A.  Yes.

21  Q.  And you thought that was pretty important?

22  A.  Of course.

23  Q.  Did you think it showed confusion?

24  A.  Of course.

25  Q.  It would be a pretty strong element to show your claim in

 1  this case, wouldn't it?

 2  A.  I'm sorry?

 3  Q.  It would be a pretty persuasive way for you to make your

 4  point in this case, wouldn't it?

 5              MR. SOLOMON:  Objection, your Honor.

 6              THE COURT:  Sustained.

 7              THE WITNESS:  I don't understand --

 8              THE COURT:  Sustained.  That means you don't

 9  understand.

10              THE WITNESS:  Oh, I apologize, your Honor.

11  Q.  Did you include that in your complaint?

12  A.  My lawyers did the complaint.

13  Q.  Did you review the complaint?

14  A.  I think so.

15  Q.  And you didn't note that what you thought was very

16  important was not included in the complaint?

17              MR. SOLOMON:  Objection.

18              THE COURT:  No, no, no.  First of all, I sustained the

19  objection to the previous question.  Furthermore, the jury

20  should be made aware that a complaint doesn't have to list each

21  and every item of detail, it simply is a statement of the

22  simple and concise statement of the claims being made as a

23  legal matter.

24              Sustained.

25  Q.  Did you mention that in your deposition?

1              MR. SOLOMON:  Objection.

2              THE COURT:  Sustained.

3   Q.  You own the companies that brought this lawsuit?

4   A.  Do I own it?

5   Q.  Yes.  You own the two companies that brought this lawsuit?

6   A.  Part owner, yes.

7   Q.  You run the businesses?

8              MR. SOLOMON:  Objection.

9              THE COURT:  Overruled.

10             THE WITNESS:  Yes.

11  Q.  You consider your title to be, quote-unquote, everything,

12  right?

13             MR. SOLOMON:  Objection.

14             THE COURT:  Overruled.

15             THE WITNESS:  I hope so.

16  Q.  Because you do everything?

17  A.  I try.

18  Q.  I think you said you brought -- you made the decision to

19  bring this suit?

20             MR. SOLOMON:  Objection.

21             THE COURT:  Overruled.

22             THE WITNESS:  I instructed my lawyers to sue New

23  York & Company for infringing on my label.

24  Q.  It was your decision to bring this lawsuit?

25  A.  It was a decision of me and my lawyers.

1    Q.  Was it your decision?

2              MR. SOLOMON:  Objection.

3              THE COURT:  Sustained.

4    Q.  You buy product from factories for resale?

5    A.  No.

6    Q.  Do you purchase product from factories?

7    A.  No.  We manufacture.

8    Q.  You purchase product from manufacturers?

9    A.  No.

10   Q.  Who do you purchase product from?

11   A.  We don't purchase, we place orders with the factories, and

12   we instruct them to produce them for us.

13   Q.  And that's different than purchasing them from factories?

14   A.  Yes.

15   Q.  And you largely sell to discount retailers?

16             MR. SOLOMON:  Objection.

17             THE COURT:  Ground?

18             MR. SOLOMON:  Characterization.

19             THE COURT:  Overruled.

20             THE WITNESS:  Repeat the question, please.

21             THE COURT:  The question was:  "And you largely sell

22   to discount retailers?"

23             THE WITNESS:  We started selling, but the business is

24   growing, and we going after people like Foot Locker's and

25   better stores.

1    Q.  Do you largely sell to discount retailers?

2            THE COURT:  Sustained.  Asked and answered.

3    Q.  Now, the average price point for your Velocity line is

4    19.99 to 29.99?

5    A.  Selling?  Retail is selling it?

6    Q.  Yes.

7    A.  The retail price that the stores sell?

8    Q.  Well, let me reask you the question.

9    A.  Please.

10   Q.  The average retail price sold in stores for your Velocity

11   line is 19.99 to 29.99?

12   A.  It's a confusing question.  The prices that I sell to

13   retailers or the retailers sell to consumers?

14   Q.  What's your average -- what's the average price that

15   retailers sell your Velocity line to consumers?

16   A.  7.99 to 39.99.

17   Q.  In fact, some of those retailers sell your products for as

18   low as $5?

19   A.  I don't know about that.

20   Q.  Some of your products are not unique; is that fair?

21           MR. SOLOMON:  Objection.

22           THE COURT:  Sustained.

23   Q.  Some of your products look identical to products in the

24   market?

25           MR. SOLOMON:  Objection.

 1          THE COURT:  Sustained.

 2   Q.  You sometimes sell the same clothing under different

 3   labels?

 4          MR. SOLOMON:  Objection.

 5          THE COURT:  Overruled.

 6          THE WITNESS:  We might have the same basic legging

 7   selling under different labels, but it's just a legging.

 8   Q.  So you do sell the same garments under different labels?

 9   A.  It's a possibility.

10   Q.  Is it fair to say that you try to compete on price and

11   relative quality and not the uniqueness of your product?

12          MR. SOLOMON:  Objection.

13          THE COURT:  Sustained.

14   Q.  You testified earlier about your trademark registration?

15   A.  Yes.

16   Q.  Trademark registration for the word Velocity?

17   A.  Yes.

18   Q.  It's owned by 4 Pillar Dynasty LLC?

19   A.  Yes.

20   Q.  Now, 4 Pillar Dynasty LLC doesn't sell anything?

21   A.  No.

22   Q.  The trademark is licensed to Reflex Performance Resources

23   Incorporated?

24   A.  Yes.

25   Q.  That's an exclusive license?

```
 1    A.  Yes.

 2    Q.  That license is not filed with the United States Patent and

 3    Trademark Office?

 4    A.  Velocity?

 5    Q.  Yes.

 6    A.  Of course it is.  We have the certificate.

 7    Q.  No, no.  I'm asking you about the license between 4 Pillar

 8    and Reflex Performance Resources.  That license is not filed

 9    with the United States Patent and Trademark Office?

10              MR. SOLOMON:  Objection.

11              THE COURT:  Sustained.

12    Q.  You selected the name Velocity as a label for activewear?

13              MR. SOLOMON:  Objection.

14              THE COURT:  Overruled.

15              THE WITNESS:  I came up with it, yes.

16    Q.  And you're the one that decided to put it on the garment?

17    A.  I discussed it with TJ Maxx, and we decided that it's a

18    good label to put on.

19    Q.  So the decision to use the Velocity label was made in

20    conjunction with TJ Maxx?

21    A.  Yes.

22    Q.  What did they tell you?

23              MR. SOLOMON:  Objection.

24              THE COURT:  No, the objection that otherwise would lie

25    was clearly waived.  Overruled.
```

 1              THE WITNESS:  Repeat the question, please.

 2   Q.  What did TJ Maxx tell you?

 3   A.  They loved it.

 4   Q.  Did they say any reason why they loved it?

 5   A.  It sounded good to them.  At that point I just wanted to

 6   get the product out, make the product, design the product, and

 7   ship it.

 8   Q.  Isn't it true you were thinking about performance

 9   activewear for dancing and movement when you chose that name?

10              MR. SOLOMON:  Objection.

11              THE COURT:  Overruled.

12              THE WITNESS:  I don't think it was the specific

13   concept for that, but there were a lot of factors at this

14   point.  I don't remember.

15   Q.  You just said that you wanted to get the name on the label

16   and ship it out.  Is that what you just said?

17   A.  I said my main concern was to design the product, produce

18   it, and ship to the customer.

19   Q.  And you didn't do any research to see if other companies

20   were using Velocity before you launched it, did you?

21   A.  I don't remember.

22   Q.  Do you remember being deposed in a lawsuit against Saucony

23   related to the Velocity trademark?

24   A.  We sued Saucony, yes.

25   Q.  Do you remember being deposed in that case?

1   A.   Yes.

2   Q.   You took an oath to tell the truth in that case?

3   A.   Yes.

4   Q.   Just like you did here today?

5   A.   Yes.

6           MR. O'REILLY:  Your Honor, I'm going to play a clip

7   from that deposition as impeachment.

8           THE COURT:  Well, you need to give me a transcript and

9   tell me what lines you want to play before I can rule on that.

10          Page and line?

11          MR. O'REILLY:  Yes, your Honor.  Page 72, lines 6

12   through 15.

13          THE COURT:  I don't see the basis for that.  If you

14   want to approach the sidebar and show me, I'm happy to hear

15   you.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  The question is that preceded this was,

3     "Did you do any research?" and he said, "I don't remember."

4     And page 72, lines 6 through?

5              MR. O'REILLY:  15, the second clause.  The first one

6     is just --

7              THE COURT:  I see.  Okay.  I was looking at the first

8     part.

9              I'm sorry, I misunderstood where you were going.  So I

10    will allow that.

11             MR. SOLOMON:  Your Honor, before -- if I may, the rest

12    of the quotation, 16 through 24, actually corroborates exactly

13    what Mr. Hedvat just said on the stand.

14             MR. O'REILLY:  I would disagree with that.

15             THE COURT:  Hold on.

16             Let me put some questions to the witness, and then

17    I'll be able to rule more clearly.

18             MR. SOLOMON:  Okay.

19             MR. O'REILLY:  Sure.

20             (Continued on next page)

21

22

23

24

25

 1                   (In open court)

 2             THE COURT:  Mr. Witness, just so I am clear, so I can

 3    rule on the issues raised at the sidebar:  You came up with

 4    name Velocity, yes?

 5             THE WITNESS:  Yes, your Honor.

 6             THE COURT:  And you then ran it by TJ Maxx?

 7             THE WITNESS:  Yes, your Honor.

 8             THE COURT:  And they said they loved it, or words to

 9    that effect?

10             THE WITNESS:  Yes, your Honor.

11             THE COURT:  And then what did you do after that?

12             THE WITNESS:  They wanted me to produce the goods with

13    the label Velocity, so --

14             THE COURT:  I mean in terms of the trademark.

15             THE WITNESS:  Oh.  Nobody said anything about

16    trademark.

17             THE COURT:  Excuse me?

18             THE WITNESS:  Nobody said --

19             THE COURT:  Nobody said anything about trademark?

20             Did you have a concern as to whether or not anyone

21    else was already using the term "Velocity"?

22             THE WITNESS:  No, your Honor.  I didn't know better.

23             THE COURT:  Pardon?

24             THE WITNESS:  I didn't know better, no, no.  I

25    didn't -- I didn't have no concern.

1          THE COURT:  Okay.  If you didn't know better, then you

2     didn't do any research on that subject at the time, did you?

3          THE WITNESS:  In all honesty, I don't remember.  If I

4     have, I might have gone to check maybe on a basic matter but

5     nothing to the point to --

6          THE COURT:  What I'm getting at is, I'm a little

7     confused when you say you don't remember.  If, as I think you

8     just testified, when you chose the name, you had no concern

9     about whether anyone else was using the name -- true?

10          THE WITNESS:  I didn't know any better, your Honor.

11          THE COURT:  I understand.  So you didn't know that you

12     had to check, and therefore you didn't.

13          When you say you don't remember, I guess what I'm not

14     clear about is:  If you didn't know you had to check and you

15     didn't have any concern about having to check, then why would

16     you check?

17          THE DEFENDANT:  What I'm saying is, I didn't know

18     better that I have to trademark the label or if it's available

19     or if it's not at that point, but it's a long, long time ago.

20          THE COURT:  I understand.

21          So let me put it to you this way:  Recognizing that no

22     one's memory is perfect, is it your best current recollection

23     that you did not, at the time that you came up with the name

24     Velocity and agreed with TJ Maxx to use it, that you did not do

25     any research into whether anyone else was using it?  Is that

1   your best recollection?

2          THE WITNESS:  Yes, your Honor.

3          THE COURT:  Okay, very good.

4          So I don't see any need to go further on that.

5          MR. O'REILLY:  Understood, your Honor.

6   BY MR. O'REILLY:

7   Q.  Is it fair to say that currently you don't search the

8   Internet to see if competitors are using the word "Velocity" in

9   conjunction with activewear?

10         MR. SOLOMON:  Objection.

11         THE COURT:  Overruled.

12  A.  If I search Internet these days?

13  Q.  Is it fair to say that currently you don't search the

14  Internet to see if competitors are using the word "Velocity" in

15  connection with activewear?

16  A.  After finding out that you guys use it, I search it every

17  day, yes, and we discuss it with our lawyers every day.

18  Q.  Have you found a lot of competitors using the word

19  "Velocity" in connection with activewear?

20  A.  I've seen people selling it on Amazon and I've seen

21  paperwork that my lawyer has presented to them.  We are

22  currently dealing with it one by one, but right now we have to

23  deal with you guys because you are the big fish.

24  Q.  Meaning New York & Company?

25  A.  Yes, New York & Company, who's infringed on my label.

1   Q.  And you sued Saucony?

2   A.  Yes, we're currently suing Saucony.

3   Q.  For use of the "Velocity" word in connection with

4   activewear?

5   A.  Yes.

6   Q.  Do you know approximately how many other competitors you've

7   found that use Velocity in connection with activewear?

8   A.  No.

9   Q.  You have no idea or you don't remember now?

10          MR. SOLOMON:  Objection.

11          THE COURT:  Overruled.

12  A.  You need to know exact -- what I saw on the Internet?

13  Q.  No.  I'm asking you if you generally understand -- strike

14  that.

15          I want to know if you have a general awareness or if,

16  sitting here today, you have an estimate of how many

17  competitors you found using the word "Velocity" in connection

18  with activewear.

19          MR. SOLOMON:  Objection, your Honor.

20          THE COURT:  Overruled.

21  A.  I just want to clear something, that my main concern is the

22  legging, capri, sports bras, sports tank.  I don't care about

23  the bicycle jackets, bicycle wear, I don't care about

24  motorcycle jackets, I don't care about shoes, I don't care

25  about swimwear.  These thing don't concern me.  I don't care

1   about men's.  My main concern is people who infringe my

2   Velocity label on leggings, capris, sport bras and tanks.

3   Q.  Well, let's take that one at a time.

4          Do you have any idea -- strike that.

5          I can describe it as the products that you care about.

6   Do you understand what I'm saying if I say that?

7   A.  The products that I care about?

8   Q.  You just said those are products that you care about,

9   right?

10  A.  It's the product that we emphasize and are $40 million that

11  we do is consisting of mostly those products.

12  Q.  I understand.  I just want to be able to have a

13  conversation and talk about the same things.

14  A.  Please.

15  Q.  So if I say the products that you care about, you

16  understand what I'm saying, right?

17  A.  Yes.

18  Q.  Do you have an estimate of the number of competitors using

19  the word "Velocity" in connection with the products that you

20  care about?

21  A.  No, I don't know exactly.

22  Q.  Do you have any idea?

23  A.  There are some that they using the label "Velocity," and

24  one by one, me and my lawyers, we will have to make our

25  business decisions to deal with them one by one, but first we

1   are here to deal with New York & Company.

2   Q.  I understand that, but I'm asking you, you clearly are

3   conveying that you found other people, right?

4   A.  There are some people that they might be selling one or two

5   piece on Amazon.  We not going there yet.  We dealing with it

6   one by one, just like Saucony.  Saucony got sued because they

7   infringed on my Velocity label.  So one by one, whoever is out

8   there, whoever many of these -- one, ten, five -- we'll deal

9   with it one by one.

10  Q.  I understand that.  My question is different.

11          THE COURT:  No, no, no.  I think this is not becoming

12  a useful dialogue.

13          MR. O'REILLY:  Understood, your Honor.

14          THE COURT:  Of the companies that you have become

15  aware of using the term "Velocity" in connection with the

16  garments that you just referred to as being the ones you're

17  most concerned with, have you seen two or three, six or seven,

18  20 or 30?  What counsel wants to know is:  What's your ballpark

19  estimate as to how many you've seen?  So what is the answer to

20  that?

21          THE WITNESS:  Five to ten.

22          THE COURT:  Okay.

23  BY MR. O'REILLY:

24  Q.  Can you just, again, tell me what exactly are the products

25  that you care about?

 1              MR. SOLOMON:  Objection.

 2              THE COURT:  No.  I didn't like it when defense counsel

 3    adopted that, so I think it's better to use some specificity.

 4              It's leggings, yes?

 5              THE WITNESS:  Leggings, capris, sport bras, sport

 6    tanks, and hoodies.

 7              THE COURT:  Okay, those five.

 8    Q.  Do you sell products, other than these five products, under

 9    the brand name Velocity?

10    A.  I apologize, you can add shorts to that, sports shorts.

11              THE COURT:  Okay.

12    A.  Not relatively, no.

13    Q.  Do you sell any products under the brand name Velocity,

14    other than these six products?

15    A.  I don't think so.

16    Q.  You sell jackets, don't you?

17    A.  Yes.  Those are hoodies.  We call them hoodies, jackets.

18    Q.  So is a hoody not a sweatshirt?

19    A.  Hoody could be sweatshirts, hoody could be a tek jacket,

20    made in the same material as the leggings but they made a

21    jacket out of it.

22    Q.  So you don't make a rough fabric jacket under the name

23    Velocity?

24              MR. SOLOMON:  Objection.

25    A.  What is rough?

1   Q.  Not sweatshirt material.

2   A.  Yes, we do.

3   Q.  Okay.  And that you consider to be a hoody?

4   A.  We call it a jacket or hoody.

5   Q.  So can we put jacket on the list of things you care about?

6   A.  Yes, you can.

7   Q.  Your trademark registration for the word "Velocity"

8   contains a number of products that you don't care about, right?

9           MR. SOLOMON:  Objection.

10          THE COURT:  As phrased, sustained.

11          MR. O'REILLY:  Do you want me to rephrase it, your

12  Honor?

13          THE COURT:  Yes.

14          MR. O'REILLY:  Okay.

15  Q.  Your trademark registration lists a number of uses in

16  addition to the seven we just discussed, correct?

17  A.  Yes.

18  Q.  Do you know what some of those uses are?

19  A.  No.  I have to read it.  This is from long time ago, the

20  description that the lawyers did.  Probably bicycle shorts, and

21  whatever that I don't care about.

22  Q.  Bicycle shorts -- one second.

23  A.  If I remember correctly.

24  Q.  Would socks be one of them?

25  A.  Right, so I don't care about socks, I don't care about

1    sweaters, I don't care about denim, I don't care about bicycle

2    shorts.

3    Q.  What about loungewear?

4    A.  I care about loungewear, I must say.

5    Q.  What about shirts?

6    A.  No.  Shirts, no.

7    Q.  You don't care about those?

8    A.  You can have it.

9    Q.  What about tights?

10   A.  Tights are leggings.  It's a different word.

11   Q.  I see, you care about tights.

12          What about T-shirts?

13   A.  T-shirts could be described as this shirt here.  You could

14   call it shirt or T-shirt, yes, sports tank, tank tops and sport

15   shirts.

16   Q.  So let's use a little more precise language.  I think the

17   judge will be happier with me.

18          Shirts, denims, bicycle shorts and socks and sweaters,

19   those are uses listed on your trademark registration that you

20   don't sell products for, correct?

21          MR. SOLOMON:  Objection.

22          THE COURT:  Ground?

23          MR. SOLOMON:  Sorry, I didn't hear, your Honor.  I

24   apologize.

25          THE COURT:  Ground?

 1              MR. SOLOMON:  Mischaracterizes the testimony.

 2              MR. O'REILLY:  I'm asking a question, your Honor.

 3              THE COURT:  No, I think that's a fair question.  It

 4     didn't purport to characterize his testimony.  It put a new

 5     question.  The new question was:  Are those products that you

 6     don't sell?  That was the question.  That was a brand new

 7     question.  It's perfectly permissible.  I overrule that.

 8              MR. SOLOMON:  Thank you, your Honor.

 9     A.  So from the list that it mentions here, those are not the

10     one that I don't want.  Plus, I don't care about motorcycle

11     jackets --

12              THE COURT:  No, no, no.  The question is no longer

13     about what you care about and don't care about.

14              THE WITNESS:  Okay.

15              THE COURT:  The question is:  Do you sell products

16     under the Velocity trademark in any of the following:  First,

17     shirts?

18              THE WITNESS:  No.

19              THE COURT:  Denim?

20              THE WITNESS:  You mean -- I apologize, your Honor, the

21     shirts, you meant the shirts, woven shirts, not T-shirts?

22              MR. O'REILLY:  There is a separate T-shirt, so it will

23     be non-T-shirt shirts.

24              THE WITNESS:  Right; no.

25              THE COURT:  Denim?

 1                THE WITNESS:  No.

 2                THE COURT:  Bicycle shorts?

 3                THE WITNESS:  No, your Honor.

 4                THE COURT:  Socks?

 5                THE WITNESS:  No.

 6                THE COURT:  T-shirts?

 7                THE WITNESS:  T-shirts, again, your Honor, could be

 8      categorized as the sports shirt.

 9                THE COURT:  So the answer is, depending on your

10      definition, maybe yes?

11                THE WITNESS:  Yes, your Honor.

12                THE COURT:  Anything else?

13                MR. O'REILLY:  Sweaters.

14                THE COURT:  Sweaters?

15                THE WITNESS:  No.

16                THE COURT:  Okay.

17      BY MR. O'REILLY:

18      Q.  Have you ever sold those products under the name trade name

19      Velocity?

20      A.  Not that I recall.

21      Q.  Now, this trademark registration doesn't distinguish

22      between what you do and do not sell, correct?

23      A.  Don't understand.

24      Q.  You've just described or told us that on the list of uses,

25      you sell some and you don't sell others.  And I'm saying that

 1   your trademark registration does not convey that information,

 2   correct?

 3   A.  Looks that way.

 4   Q.  Isn't it true your company swore under oath to the United

 5   States Patent and Trademark Office that you used the name

 6   "Velocity" on all of the uses listed here?

 7             MR. SOLOMON:  Objection, your Honor.

 8             THE COURT:  Ground?

 9             MR. SOLOMON:  May we approach for a sidebar?

10             THE COURT:  All right.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                    (At the sidebar)

 2            MR. SOLOMON:  It's an unfair question, your Honor.

 3   It's a 1(d) application.  It's an intent-to-use application.

 4   So by asking that question --

 5            THE COURT:  Yes, I agree.

 6            MR. O'REILLY:  There's an additional sworn statement

 7   of use after the intent to use.

 8            THE COURT:  Where is the sworn statement?

 9            MR. O'REILLY:  We're going to grab it.  It's this.

10            MR. OVED:  Can I see it?

11            With any item in the class.

12            THE COURT:  Well, I'm looking at what's been marked as

13   Defendants' Exhibit 119, which is a document submitted to the

14   Commissioner for Trademarks in connection with the Velocity

15   mark, and it's entitled "Trademark/Service Mark Statement of

16   Use."  It's dated December 3rd, 2013.

17            MR. O'REILLY:  Your Honor, here's a line, if that

18   helps.

19            THE COURT:  And it states in the declaration by

20   Mr. Michael Sproule, who is the attorney, "Applicant is the

21   owner of the mark sought to be registered and is using the mark

22   in commerce or in connection with the goods/services identified

23   above, as evidenced by the attached specimens showing the mark

24   is used in commerce."  And the attachment is some sort of --

25            MR. SOLOMON:  I think it's a legging, your Honor.

 1            THE COURT:  A legging, thank you.  This is beyond the

 2   Court's expertise.

 3            MR. SOLOMON:  Mine too, your Honor.

 4            THE COURT:  So I don't see how that is anything like a

 5   statement that they used the mark on all the things that he

 6   just said they don't use the mark on.

 7            MR. O'REILLY:  Your Honor, I think it's fair that we

 8   not go further into this.  I think the law -- I know the law is

 9   that a statement of use is for each one of those.

10            THE COURT:  That what?

11            MR. O'REILLY:  A statement of use is for each of the

12   uses listed.

13            THE COURT:  Well, you better show me the law.  What

14   you're saying to me -- I don't see it as impeachment, in any

15   event -- what you're saying to me is that a statement that he

16   did not author, that on its face, under the general principles

17   of English usage and grammar, does not mean each and every one

18   of those items, nevertheless, by operation of law, includes all

19   those items and therefore is an impeachment of his statement

20   that he doesn't use it on certain of these goods.  I don't

21   think that is proper impeachment.

22            MR. O'REILLY:  Your Honor, I understand what you're

23   saying and I agree with you and I hear that, I agree, but this

24   is important for a separate issue, because it arguably

25   invalidates the trademark registration.

 1              THE COURT:  You may want to introduce it separately --

 2      that's a different question -- but right now it was being

 3      offered for impeachment.

 4              MR. O'REILLY:  I did incorrectly.

 5              THE COURT:  If you want to show him this and say did

 6      you authorize this and you think it's relevant for other

 7      grounds, that's of course fair to do.

 8              MR. O'REILLY:  I'm just going to follow up with the

 9      simple question, which is:  At this date, did you know you

10      weren't using it on these goods?  And then I'll be done with

11      it.

12              THE COURT:  No, that's again using it for impeachment

13      purposes.

14              MR. O'REILLY:  No, no, I'm going to say in --

15              THE COURT:  I'm not going to allow that, but this is

16      probably self-authenticating.

17              Aside from this witness, do you have any objection to

18      the introduction of this exhibit?

19              MR. SOLOMON:  No, your Honor.

20              THE COURT:  So Exhibit 919 will be received, and I

21      will tell that to the jury, but it's not going to be used for

22      impeachment.

23              (Continued on next page)

24

25

1           (In open court)

2           THE COURT:  So, ladies and gentlemen, first, you my

3    wonder why we have sidebars.  Contrary to your assumption, it's

4    not so that we can bore you, it's not even so that you can get

5    a quick nap, it is because I have to rule on evidence that is

6    proffered that is going to come in subsequently, because if it

7    should not be admitted, then you should never hear it.  So, in

8    other words, I have to hear at the sidebar what someone said is

9    going to be the answers given to three or four questions down

10   the line and if the line is irrelevant, for example, then I

11   have to exclude it.  If we did that all in front of you, it

12   would be a pointless exercise, you'd hear all of the

13   inadmissible testimony.  So you will forgive us if we

14   occasionally have to have sidebars.

15          Second, the objection to the pending question is

16   sustained.

17          Third, an exhibit which the jury has not yet seen but

18   which you may see tomorrow, Defendants' Exhibit 119, is

19   received on consent.

20          (Defendants' Exhibit 119 received in evidence)

21          THE COURT:  And, fourth, it is 4:00 o'clock, so we

22   will break for today.

23          Now, let me tell you the schedule for tomorrow.  We

24   will start at 9:30.  It's really critical you be on time

25   because we're not sitting a full day tomorrow.  We will go till

1   1:30, a little past our normal lunchtime, but will take a

2   couple of breaks in the middle, maybe around 11:00 or maybe

3   around 12:00, so you'll have a little break in the action, but

4   then that's all we'll do.  So we'll sit from 9:30 to 1:30.

5   After 1:30, you're free for the rest of tomorrow.

6           So, thank you very much.  We're off to a good start.

7   We will see you tomorrow.  Have a good evening.

8           THE WITNESS:  Thank you, your Honor.

9           MR. OVED:  Thank you.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                    (Jury not present)

 2          THE COURT:  You may step down.  Now, while you're on

 3   cross-examination, you cannot talk to your counsel.  So just go

 4   about your business and we'll see you tomorrow morning at 9:30.

 5          THE WITNESS:  Thank you, your Honor.

 6          THE COURT:  Anything else we need to take up today?

 7          MR. SOLOMON:  No, your Honor.

 8          THE COURT:  Okay, very good.  I have other matters, so

 9   do your best to vacate the premises promptly and we'll see you

10   tomorrow morning.

11                    (Adjourned to February 7, 2017 at 9:30 a.m.)

12                                   * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

BEHROOZ HEDVAT

Direct By Mr. Solomon  . . . . . . . . . . . .37
Cross By Mr. O'Reilly  . . . . . . . . . . . .95


PLAINTIFF EXHIBITS

Exhibit No.                                    Received

1   . . . . . . . . . . . . . . . . . . . . .48

2   . . . . . . . . . . . . . . . . . . . . .50

3   . . . . . . . . . . . . . . . . . . . . .60

4   . . . . . . . . . . . . . . . . . . . . .64

5   . . . . . . . . . . . . . . . . . . . . .66

6   . . . . . . . . . . . . . . . . . . . . .71

7   . . . . . . . . . . . . . . . . . . . . .75

8   . . . . . . . . . . . . . . . . . . . . .77

9   . . . . . . . . . . . . . . . . . . . . .79

10   . . . . . . . . . . . . . . . . . . . . .81

11   . . . . . . . . . . . . . . . . . . . . .83

12   . . . . . . . . . . . . . . . . . . . . .92

DEFENDANT EXHIBITS

Exhibit No.                                    Received

119   . . . . . . . . . . . . . . . . . . . . 120