UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------
4 PILLAR DYNASTY LLC and REFLEX
PERFORMANCE RESOURCES, INC.,

     Plaintiffs,

     -v-

NEW YORK & COMPANY, INC. and
NEW YORK & COMPANY STORES, INC.,

     Defendants.
----------------------------------------x

:
:
:
:
:
:
:
:
:
:
:

16 Civ. 2823 (JSR)

OPINION, ORDER, AND
AMENDED JUDGMENT

JED S. RAKOFF, U.S.D.J.

     Following a trial, a jury found defendants New York & Company,

Inc. and New York & Company Stores, Inc. (collectively, "New York &

Company") liable for infringing the trademark of plaintiffs 4 Pillar

Dynasty LLC ("4 Pillar") and Reflex Performance Resources, Inc.

("Reflex"). The Court entered judgment awarding plaintiffs

$5,593,011.87 -- three times defendants' stipulated gross profits

from the infringing products -- and enjoining defendants from using

plaintiffs' trademark in connection with their products (the

"Judgment"). Now before the Court is defendants' motion for judgment

as a matter of law and to alter or amend the Judgment, which seeks

to vacate the monetary award. Also before the Court is plaintiffs'

motion for attorneys' fees and for pre- and post-judgment interest.

For the reasons explained below, the Court amends the Judgment to

reduce the monetary award to $1,864,337.29, and also grants

plaintiffs' motion and instructs plaintiffs to submit a calculation

of their attorneys' fees and interest.

The relevant facts and background may be briefly summarized as follows. 4 Pillar and Reflex, two companies owned by Behrooz Hedvat and his brothers, design and sell women's apparel, including spandex clothing intended to be used for yoga and other "activewear." Trial Transcript ("Tr.") 38. On March 12, 2012, plaintiffs applied to register the trademark "Velocity" (the "Velocity mark"). Plaintiffs' Trial Ex. ("PX") 1. On March 11, 2014, the Velocity mark was registered for "clothing and performance wear" including, as relevant here, leggings, pants, sports bras, tank tops, and hooded sweatshirts. PX 2; Tr. 50. 4 Pillar holds the trademark, and Reflex pays a royalty to 4 Pillar to use the trademark on the goods that Reflex produces. Tr. 38. Reflex sells clothing with the Velocity mark to retailers such as TJ Maxx, Marshalls, Ross, and Foot Locker, and it also sells clothing online, through Amazon.com or its own website. Tr. 51-52. Plaintiffs maintain a showroom in Manhattan where buyers representing retailers can view samples of plaintiffs' products. Id.

In 2015, a buyer came to plaintiffs' showroom and asked Hedvat whether 4 Pillar had licensed the Velocity mark to New York & Company. Tr. 82. Surprised by the question, Hedvat looked at New York & Company's website and discovered that New York & Company was marketing a collection of activewear using the label "NY&C Velocity" (the "NY&C Velocity mark"). Tr. 82-83; see PX 11.

Plaintiffs thereupon filed this action on April 15, 2016. See Compl., ECF No. 1. While they asserted several causes of action

2

under the Federal Lanham Act and New York law, all of their claims rested on the allegation that defendants' use of the NY&C Velocity mark infringed plaintiffs' Velocity mark. Compl. ¶¶ 13-51. In their pre-trial submissions, plaintiffs made clear that they did not seek to prove that they suffered actual damages from any infringement, but rather they sought to recover defendants' profits from the sale of NY&C Velocity products. Proposed Pre-trial Consent Order 6, ECF No. 25.

The case went to trial on February 6, 2017. In defendants' opening statement, they asserted that Yelena Monzina and Christine Munnelly -- respectively the creative director and the head of merchandising of New York & Company -- would testify that when they decided to use the NY&C Velocity mark they believed that no consumer would be confused. Tr. 33, 36-37. Specifically, defendants asserted that Monzina would testify that after she came up with NY&C Velocity as a name she ran a trademark search that turned up several trademarks including the word "Velocity," but that she did not recall encountering plaintiffs' mark. Tr. 33-34.

Plaintiffs called only one witness, Hedvat, who testified during his direct examination about the creation and registration of the Velocity mark and the products on which it was used. See generally Tr. 37-91. After describing his discovery of the products bearing the NY&C Velocity mark following the buyer's inquiry about a licensing arrangement between 4 Pillar and New York & Company, Hedvat testified that he called his lawyers and asked them to

3

request that New York & Company stop using the Velocity mark. Tr.
86. He further testified that defendants did not stop using the mark
after being contacted by plaintiffs' lawyers, id., though on cross
examination he could not recall whether the lawyers sent defendants
a cease-and-desist letter or simply initiated this action, Tr. 210-
11. After Hedvat's examination concluded, plaintiffs read into
evidence a stipulation by the parties that defendants' gross profits
from the sale of products bearing the NY&C Velocity mark were
$1,864,337.29. Tr. 275.

Plaintiffs then rested, and defendants moved for judgment as a
matter of law, which the Court denied:

THE COURT: All right. Does plaintiff rest?

MR. SOLOMON: Yes, your Honor.

THE COURT: Okay. The defense will call their first witness.

MR. O'REILLY: Your Honor, before we do that, we'd just like to
move for a judgment --

THE COURT: Ah, yes, okay. That motion is properly made and is
equally properly denied.

MR. O'REILLY: As expected. Thank you, your Honor.

Tr. 276. Defendants then rested without putting on any evidence, id.,
despite their earlier representation that they would call Monzina
and Munnelly.

Later the same day, while the Court discussed with the parties
the instructions of law for the jury, defendants expressed their
position that an award of profits under the Lanham Act required a
finding of willfulness. Tr. 301-02. Both sides agreed that the

4

determination of whether any infringement was willful was a matter for the Court to decide. Tr. 300-01. The Court decided, however, that it would seek an advisory verdict from the jury on the issue of willfulness (as well as the binding verdict on the issue of infringement).

On February 10, 2017, the case was submitted to the jury with instructions as to the determination of whether there was infringement and, if so, whether such infringement was willful. Tr. 336-49. The jury returned a verdict of infringement with an advisory finding that the infringement was willful. Tr. 354. That same day, the Court entered judgment "agree[ing] with the jury's opinion as to willfulness" and "holding defendants jointly and severally liable to plaintiffs in the amount of $5,593,011.87," as well as "enjoin[ing] defendants from using in connection with their products the term 'NY&C Velocity' as well as the term 'Velocity,' alone or in conjunction with other words." Judgment (Feb. 10, 2017), ECF No. 34. The Judgment indicated that an opinion explaining the reasons for the rulings therein would issue shortly. Id.

On February 22, the Court granted defendants' request that the Court stay the execution of the Judgment and forebear issuing an opinion pending the disposition of defendants' post-trial motion. Memo Endorsement (Feb. 22, 2017), ECF No. 39. On February 24, plaintiffs filed a motion seeking a declaration that they were entitled to attorneys' fees, a fourteen-day period in which to submit their invoices for those fees, and an award of pre- and post-

judgment interest. Notice of Mot. (Feb. 24, 2017), ECF No. 40; Decl.

of Aaron J. Solomon in Supp. of Mot. ("Solomon Decl. dated Feb 24,

2017"), ECF No. 41. On March 2, defendants filed their motion.

Notice of Mot. (Mar. 2, 2017), ECF No. 52; Mem. of Law (1) in Supp.

of Defs.' Mot. for J. as a Matter of Law and to Amend or Alter the

J., and (2) in Opp. to Pls.' Mot. for Att'ys' Fees and Pre-J.

Interest ("Defs. Mem."), ECF. No. 53.

The Court turns first to defendants' motion, which is styled as

a motion for judgment as a matter of law dismissing plaintiffs'

claim for damages under Federal Rule of Civil Procedure 50(b) and to

alter or amend the Judgment under Rule 59(e). The relief defendants

seek is straightforward: they do not challenge the jury's

determination of infringement, and they therefore accept the

injunction contained in the Judgment,[1] but they seek to vacate the

monetary award on the ground that there is no legal basis for such

an award. Specifically, they contend that a monetary award under the

Lanham Act requires findings of actual confusion and willfulness,

---

[1] As to the award of injunctive relief, the Lanham Act authorizes
district courts to "grant injunctions, according to the principles
of equity and upon such terms as the court may deem reasonable, to
prevent the violation of any right of the registrant of a mark." 15
U.S.C. § 1116(a). Such "injunctive relief [should] be 'no broader
than necessary to cure the effects of the harm caused'" by the
infringement. Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 750 (2d
Cir. 1994) (quoting George Basch Co. v. Blue Coral, Inc., 968 F.2d
1532, 1542 (2d Cir. 1992)). Given the jury's finding that
defendants' use of the NY&C Velocity mark infringed plaintiffs'
Velocity mark, the Court concluded that the injunction set out in
the Judgment was necessary to protect plaintiffs' rights in the
Velocity mark.

and that there is insufficient evidence in the trial record to support either finding.

As a threshold matter, defendants have waived this challenge. It is a requirement of motions under Rules 50 and 59 that the movant have previously put before the Court the grounds for their motion, rather than raising an argument for the first time in a post-judgment challenge. Defendants had ample opportunity to raise their challenge to the adequacy of evidence of willfulness at trial but failed to do so.

Under Rule 50, "[a] motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). If a court denies such a motion, the movant may, within a certain time after the entry of judgment, "file a renewed motion for judgment as a matter of law." Fed. R. Civ. P. 50(b). But a renewed motion for judgment as a matter of law "is limited to those grounds that were 'specifically raised in the prior motion for [judgment as a matter of law].'" McCardle v. Haddad, 131 F.3d 43, 51 (2d Cir. 1997) (quoting Samuels v. Air Transp. Local 504, 992 F.2d 12, 14 (2d Cir. 1993)). This is known as the "specificity requirement," and "[t]he perfectly defensible rationale for this requirement is to 'prevent a party who loses at trial from using a [judgment as a matter of law] motion as a "trap" after it is too late for the winner of the verdict to cure any alleged deficiencies of proof.'" Doctor's

Assocs., Inc. v. Weible, 92 F.3d 108, 112 (2d Cir. 1996) (quoting
Meriwether v. Coughlin, 879 F.2d 1037, 1044 (2d Cir. 1989)). The
rationale for the specificity requirement is well illustrated in
this very case where, following the jury verdict, defendants brought
in new counsel who had every incentive to second-guess trial
counsel, untethered by the strategic decisions every trial counsel
must make.

Alternatively, however, defendants bring their motion under
Rule 59(e), pursuant to which "district courts may alter or amend
judgment to correct a clear error of law or prevent manifest
injustice." Munafo v. Metro. Transp. Auth., 381 F.3d 99, 105 (2d
Cir. 2004) (internal quotation marks omitted). "In a motion for
reconsideration brought pursuant to Local Rule 6.3 or [Rule] 59(e),
a plaintiff must demonstrate that the court overlooked controlling
decisions or factual matters that were put before it on the
underlying motion." Zeke N' Zoe Corp. v. Zeke N' Zoe, LLC, No. 01
Civ. 4780 (HB), 2002 WL 1000957, at *1 (S.D.N.Y. May 15, 2002). "The
standard for granting such a motion is strict, and reconsideration
will generally be denied unless the moving party can point to
controlling decisions or data that the court overlooked -- matters,
in other words, that might reasonably be expected to alter the
conclusion reached by the court." Id. (quoting Shrader v. CSX
Trans., Inc., 70 F.3d 255, 257 (2d Cir. 1995)).

Here, defendants had ample opportunity to raise the purported
deficiency of plaintiffs' proof of willfulness (or actual confusion)

as a ground for their contention that plaintiffs were not entitled
to any monetary recovery. During a conference regarding jury
instructions, they expressed the view that a finding of willfulness
was necessary to support an award of profits, Tr. 301-02, and the
Court indicated that it would seek from the jury an advisory verdict
as to willfulness, Tr. 302. Yet at no point before the case was
submitted to the jury did defendants contend that the evidence
presented at trial was insufficient to support a finding of willful
infringement. Defendants did move for judgment as a matter of law
immediately after plaintiffs rested, but (as quoted above) they did
so in a merely perfunctory manner, without specifying any particular
ground for their motion. Tr. 276.

Defendants now argue that their failure to articulate specific
grounds should be excused. First, they claim that, when they moved
for judgment as a matter of law at trial, the Court denied the
motion before defendants' counsel could articulate the ground for
the motion, and thus they should not be barred from renewing the
motion because of a lack of specificity. Reply Mem. of Law in Supp.
of Defs.' Mot. for J. as a Matter of Law and to Amend or Alter the
J. ("Defs. Reply") 9, ECF No. 64; see Wilson Sporting Goods Co. v.
David Geoffrey & Assocs., 904 F.2d 677, 683 (Fed. Cir. 1990)
(holding that "it would be unfair" to find that a party had
forfeited its right to move for judgment as a matter of law where
"the court cut short counsel's [motion for judgment as a matter of
law], making clear its view that the issue presented a jury question

9

and that it wanted to move on to consider the jury instructions"). Although the Court did deny the motion promptly after it was made, the Court in no way prevented counsel from further articulation, and defendants' counsel made no effort to put forth such a ground in order to preserve the issue. Rather, he replied: "As expected. Thank you, your Honor." Tr. 276. Defendants were in no way precluded from raising a specific ground for their motion but failed to do so, even after they had been advised that the Court would seek an advisory finding from the jury as to willfulness.

Second, defendants argue that the Court should disregard their failure to raise specific grounds because upholding the Judgment would result in manifest injustice in the form of a windfall to plaintiffs at their expense. But, as explained below, there is ample basis to find, as the Court does, that defendants' infringement was willful, and therefore an award of profits is not a windfall to plaintiffs. Moreover, defendants' "strategic decision" to rest immediately after the conclusion of plaintiffs' case, Defs. Reply 2, rather than put on evidence that their actions did not amount to willful infringement of the Velocity mark, undercuts the notion that justice requires allowing them to challenge a finding of willfulness at this time.

Nonetheless, the Court retains the authority to correct erroneous rulings. An issue that was not focused on by the parties or the Court at the time the Judgment was entered, but that the parties have now briefed, is whether the Court can and should treble

10

a monetary award on the basis of willfulness when the award
constitutes defendants' profits, not plaintiffs' damages. The Court
is now focused on the issue and decides that it is precluded from
trebling the award in these circumstances.

This conclusion follows from the statutory framework that
governs awards of monetary damages for trademark infringement under
the Lanham Act. Section 35(a) provides in relevant part:

> When a violation of any right of the registrant of a mark
> registered in the Patent and Trademark Office . . . shall have
> been established in any civil action arising under this
> chapter, the plaintiff shall be entitled . . . subject to the
> principles of equity, to recover (1) defendant's profits, (2)
> any damages sustained by the plaintiff, and (3) the costs of
> the action. The court shall assess such profits and damages or
> cause the same to be assessed under its direction.

15 U.S.C. § 1117(a). Thus, courts may award a plaintiff's damages or
a defendant's profits from the infringement (or neither) depending
on certain considerations.

Second Circuit decisions have fleshed out the "principles of
equity" that govern whether a court should award profits.
Specifically, they have identified three rationales that justify
such an award: "(1) unjust enrichment, (2) compensation, and (3)
deterrence." Merck Eprova AG v. Gnosis S.p.A., 760 F.3d 247, 262 (2d
Cir. 2014) ("Merck II") (citing George Basch Co. v. Blue Coral,
Inc., 968 F.2d 1532, 1537-39 (2d Cir. 1992)). George Basch Co., the
seminal Second Circuit case on the standard for monetary awards
under the Lanham Act, analyzed the history of these rationales and
the requirements thereunder. As to the first, "a profits award,

11

premised upon a theory of unjust enrichment, requires a showing of actual consumer confusion -- or at least proof of deceptive intent so as to raise the rebuttable presumption of consumer confusion," and it also requires that the defendant's enrichment "be the fruit of willful deception." 968 F.2d at 1538. The second rationale seeks to compensate the plaintiff for its damages, and, in order to establish such damages, "a plaintiff typically has been required to show consumer confusion resulting from the infringement." Id. at 1539. As to the third rationale, in order to "to protect the public at large" from fraud regarding the source of goods (rather than to compensate the plaintiff), "a court may award a defendant's profits solely upon a finding that the defendant fraudulently used the plaintiff's mark." Id.

It is not necessary that each of these three rationales be applicable, as a court may "award a defendant's full profits based solely on deterrence." Merck II, 760 F.3d at 262. But, under any of the rationales, "a finding of defendant's willful deceptiveness is a prerequisite for awarding profits." Id. at 261 (quoting George Basch Co., 968 F.2d at 1537).[2] Furthermore, before awarding profits, courts

_____

[2] Defendants are incorrect that a plaintiff must provide proof of actual confusion in order to receive any kind of monetary award. Rather, while recovery of a plaintiff's damages requires proof of actual confusion, see George Basch Co., 968 F.2d at 1537, an award of profits does not. While defendants claim that a "long line of Second Circuit precedent," Defs. Reply 3, supports their position that "proof of real and precise actual consumer confusion is required" for monetary recovery, W.W.W. Pharm. Co., Inc. v. Gillette Co., 984 F.2d 567, 574 n.6 (2d Cir. 1993), superseded on other grounds, Deere & Co. v. MTD Prods., Inc., 41 F.3d 39 (2d Cir.

must not only find willful infringement but also consider other

factors, "such as '(1) the degree of certainty that the defendant

benefited from the unlawful conduct; (2) the availability and

adequacy of other remedies; (3) the role of a particular defendant

in effectuating the wrongdoing; (4) plaintiff's laches; and (5)

plaintiff's unclean hands.'" Merck Eprova AG v. Gnosis S.p.A., 901

F. Supp. 2d 436, 457 (S.D.N.Y. 2012) ("Merck I"), aff'd, 760 F.3d

247 (quoting George Basch Co., 968 F.2d at 1540).

The Lanham Act also allows courts to enhance an award of

profits in certain circumstances. Section 35(a) provides:

> If the court shall find that the amount of the recovery based
> on profits is either inadequate or excessive the court may in
> its discretion enter judgment for such sum as the court shall

---

1994)), the decisions they cite establish no such rule. Gillette
concluded that, lacking proof of actual confusion, the plaintiff
there was "not entitled to any monetary recovery." Id. Since the
court had earlier found that the plaintiff had "not shown any bad
faith on [defendant's] part," id. at 575, the conclusion that the
plaintiff was not entitled to any recovery naturally followed. In
other words, the conclusion that a monetary award is unavailable
without either bad faith or actual confusion is consistent with the
proposition that a court may award profits based on willfulness even
without actual confusion.

The other authority that defendants put forth in support of the
purported actual confusion requirement is no more persuasive. They
cite another pre-George Basch Co. case for the unextraordinary
proposition that "[a] Lanham Act plaintiff seeking damages is
normally required to prove actual consumer confusion or deception
resulting from the violation." Getty Petroleum Corp. v. Island
Transp. Corp., 878 F.2d 650, 655 (2d Cir. 1989). They also cite a
Second Circuit decision from 1944, which concludes that to recover
damages or profits for trademark infringement a plaintiff must show
that a buyer was actually confused. See G.H. Mumm Champagne v.
Eastern Wine Corp., 142 F. 2d 499, 501 (2d Cir. 1944). While this
case does support defendants' position, its vintage in any case
renders it a poor reflection of the current state of the law in
light of more recent decisions in George Basch Co. and Merck II.

13

find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.

15 U.S.C. § 1117(a). Such an enhanced award may be justified "'to redress fully plaintiffs whose actual damages were difficult to prove'" and also "where 'deterrence of willful infringement is needed.'" Merck II, 760 F.3d at 263 (quoting Getty Petroleum Corp. v. Bartco Petroleum Corp., 858 F.2d 103, 110, 113 (2d Cir. 1988)). "So long as its purpose is to compensate a plaintiff for its actual injuries -- even though the award is designed to deter wrongful conduct -- the Lanham Act remains remedial." Getty, 858 F.2d at 113.[3]

Applying the above framework to the case at hand, the Court first reaffirms its prior finding (see Judgment) that defendants' infringement was willful. "The standard for willfulness is whether the defendant had knowledge that his conduct represented infringement or perhaps recklessly disregarded the possibility." Fendi Adele S.R.L. v. Filene's Basement, Inc., 696 F. Supp. 2d 368, 393 (S.D.N.Y. 2010) (internal quotation marks omitted); see also Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc., 507 Fed. App'x 26, 31 (2d Cir. 2013) (summary order) ("To prove willfulness, a

---

[3] Alongside the enhancement provision regarding profits, the Lanham Act provides that "[i]n assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." 15 U.S.C. § 1117(a). Also, the Act provides that "in a case involving use of a counterfeit mark or designation," the court shall award three times profits or damages unless there are extenuating circumstances and provided that certain conditions are satisfied. § 1117(b).

plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard or willful blindness."). Thus, actual knowledge of infringement is not necessary. Cf. N.A.S. Imp., Corp. v. Chenson Enters., 968 F.2d 250, 252 (2d Cir. 1992) (noting that, in the copyright context, the knowledge of infringement "may be actual or constructive" and "need not be proven directly but may be inferred from the defendant's conduct" (internal quotation marks omitted)).

Defendants argue that there is simply no basis in the record from which a factfinder could infer that their infringement was willful. Even defendants' refusal to stop selling the infringing goods after the filing of this action cannot support a finding of willfulness, they assert, because a decision to defend oneself in a lawsuit does not necessarily indicate bad faith. See Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 962 (7th Cir. 1992) ("Even the defendant's refusal to cease using the mark upon demand is not necessarily indicative of bad faith. Absent more, courts should not make an inference of bad faith from evidence of conduct that is compatible with a good faith business judgment." (internal quotation marks omitted)). Defendants also argue that their failure to put on evidence does not support an inference of willfulness, since plaintiffs put on no evidence of willfulness that defendants needed to refute. But despite defendants' contentions, and notwithstanding their strategic decision to cut short the

presentation of evidence at trial, the Court finds persuasive evidence in the record for a finding of willfulness.

Defendants were on notice that their use of the NY&C Velocity mark possibly infringed plaintiffs' mark when plaintiffs sued them, yet defendants continued to sell the goods in question for months thereafter. See Tr. 86. While the fact that a defendant chooses to defend its use of an allegedly infringing mark, rather than cease sales of products bearing that mark, does not necessarily mean that it willfully infringed, the case that defendants cite in support of this proposition, Sands, presented quite different circumstances from those present here. The in-house counsel for the defendant in Sands concluded that the defendant's use of the mark in question in an advertisement was merely descriptive and therefore could not infringe a trademark; this view was reiterated in an opinion letter by outside counsel. 978 F.2d at 962. In addition, the defendant learned that the owner of the trademark registration at issue was not currently using the mark on any products sold at retail. Id. Thus, the defendant in that case had undertaken some investigation and discovered quite colorable grounds to believe that continued use of the mark did not amount to infringement. Here, in contrast, there is no evidence in the record that defendants took any steps to determine whether its use of the NY&C Velocity mark was infringing plaintiffs' Velocity mark. Moreover, it is apparent to the Court that defendants did not take this litigation -- and its assertion of blatant infringement -- very seriously until the eve of trial.

Defendants did not depose Hedvat until after the original deadline for the completion of discovery, Tr. 15, and they later sought to introduce documents that they had discovered and produced to plaintiffs only a couple of weeks before trial, Tr. 10-11. Defendants' continued infringement and blithe disregard of plaintiffs' allegations of infringement therefore weighs in these circumstances in favor of a finding of willfulness. See Merck I, 901 F. Supp. 2d at 458 ("'Although awareness of an adverse claim would not necessarily make [infringement] willful, especially where the defendant believed in good faith [that it was not infringing],' where the evidence shows that the defendant 'gave short shrift to plaintiff's claim out of arrogance,' a finding of willful infringement is appropriate." (quoting Stuart v. Collins, 489 F. Supp. 827, 832 (S.D.N.Y. 1980)).

In addition, defendants' failure to call the witnesses who they had previously represented would testify regarding the decision to use the NY&C Velocity mark supports an adverse inference of willfulness. Although the Court declined to give a "missing witness" instruction to the jury, that in no way precludes the Court, as the ultimate finder of fact on the issue of willfulness, from drawing such an inference, which it does.

Specifically, while, as noted above, defendants represented in their opening statement that they would call Monzina and Munnelly, they ultimately rested without calling any witnesses. Were Monzina able to testify credibly to the purported facts that defendants

17

previewed in their opening statement -- including that a trademark search did not turn up plaintiffs' mark and that Monzina believed that there was no way that a consumer would confuse plaintiffs' products with defendants' -- it is hard to imagine that defendants would not have put her on the stand, no matter how weak they believed plaintiffs' evidence of willfulness to be. The fact that defendants chose not to call her strongly suggests that her testimony on these points would be less than credible, which in turn suggests that she had some knowledge of possible infringement. While defendants are correct that they had no obligation to put on evidence, as it was plaintiff's burden to prove willfulness, that only shows that the failure to put on evidence cannot, on its own, justify a finding a willfulness. It does not entail that a court may not draw an adverse inference that, along with other evidence, weighs toward finding willfulness. Indeed, plaintiffs, having been assured by defendants' opening statement that the defense counsel would call these witnesses, reasonably relied on the opportunity to cross-examine them as a way to further buttress its claim of willfulness. Under these circumstances, defendants cannot escape the implications of their strategic choice.

In short, while the evidence of willfulness in the record is less extensive than it might have been had defendants not strategically cut short the trial, there is nonetheless sufficient reason to find, as the Court does, that defendants willfully infringed plaintiffs' mark. Their use of the word "Velocity" on

their products was, on its face, a blatant infringement. Yet, when confronted with a lawsuit asserting that claim, defendants did not stop selling the product, took no apparent steps to determine whether they were in fact infringing plaintiffs' trademark, dragged their heels during discovery, and did not call the witnesses that they previously represented would testify to facts refuting any claim of willfulness. For those reasons, the Court, like the jury, finds that defendants engaged in willful infringement, thus authorizing an award of profits.

The Court also concludes that an award of profits is more than justified here in consideration of the factors set out in George Basch Co., 968 F.2d at 1540.

As to the first factor, "the degree of certainty that the defendant benefited from the unlawful conduct," id., defendants stipulated at trial that they made $1,864,337.29 in gross profits from the sale of clothing bearing the NY&C Velocity mark, Tr. 275. It appears probable, in light of the jury's finding that there was a likelihood of confusion between the plaintiffs' and defendants' products, that at least some sales were at plaintiffs' expense, although plaintiffs did not present evidence demonstrating this with certainty.

As to the second factor, the "availability and adequacy of other remedies," George Basch Co., 968 F.2d at 1540, it is clear that an injunction alone would not suffice, both because it would not compensate plaintiffs for whatever diverted sales did occur and

because it would not deter defendants from trademark infringement. In their briefing, defendants make clear that they had already chosen for economic reasons to abandon the NY&C Velocity line before the entry of the Judgment, see Defs. Mem. 2, and so the issuance of the injunction in no way deters them from their infringing behavior. Rather, only a monetary award will do so. Such a need for deterrence is, of course, recognized as a ground for awarding profits, even absent evidence that a defendant was unjustly enriched by the infringement. See Merck II, 760 F.3d at 262 (noting that a court may "award a defendant's full profits based solely on deterrence"). There is no suggestion that plaintiffs had unclean hands or unduly delayed in bringing this action. Thus, taking into account the equities of the case, an award of profits is justified.

However, the Court concludes that trebling the award of profits is not justified. This is not because of defendants' contention that Section 35(a) of the Lanham Act permits only the trebling of damages, not profits. It is true that that section provides, as they note, that "[i]n assessing *damages* the court may enter judgment . . . for any sum above the amount found as actual damages, not exceeding three times such amount;" but the section does not refer to an award of three times the amount of *profits*. 15 U.S.C. § 1117(a) (emphasis added). But that difference is largely irrelevant because it has been independently established that the Lanham Act allows for "[u]nlimited enhancement" of a profits award, Getty, 858 F.2d at 109, and the Second Circuit recently approved of a monetary

award that amounted to three times the defendant's profits, see Merck II, 760 F.3d at 263. Thus, the question is not whether a court can award an amount equal to three times a defendant's profits in general (it can), but whether doing so is justified here. That question primarily turns on whether such an enhancement is needed to compensate plaintiffs. See 15 U.S.C. § 1117(a) (stating that an enhanced profits award "shall constitute compensation and not a penalty").

Defendants argue that no enhancement is needed to compensate plaintiffs because plaintiffs never argued that New York & Company's profits were inadequate to compensate them, and also that even a single profits award would more than compensate plaintiffs because the amount of profits stipulated at trial does not take into account various expenses and deductions that reduce the total amount that defendants gained through their infringement. Plaintiffs contend that an enhancement of the profits award is warranted in order to compensate them for "intangibles," i.e., hard-to-measure losses of sales. Specifically, they contend that it is impossible to calculate (1) how many other sales of other products defendants made after they had lured customers to their store or website with the infringing products; (2) how many sales plaintiffs lost when customers purchased the infringing products instead of plaintiffs' products; and (3) how many sales plaintiffs lost by virtue of the fact that confused customers who purchased the infringing products were disappointed by their quality (which Hedvat claimed was

inferior, see Tr. 86-87), and did not purchase any more of plaintiffs' products. Mem. of Law in Opp. to Defs.' Mot. for J. as a Matter of Law and to Amend or Alter the J. ("Pls. Opp.") 24, ECF No. 62.

But these intangibles do not show that plaintiffs require an enhanced award, much less an award equal to three times the stipulated profits, in order to compensate them fully. The second of the supposed intangible losses referenced above merely describes sales of infringing products, the value of which is already encompassed within the award of the stipulated profits. The first and third, while distinct from the sales that are already accounted for, are entirely speculative. The first assumes that customers were drawn to New York & Company's stores or website to buy NY&C Velocity products and ended up buying other products as well. While not impossible, plaintiffs have never attempted to show that this did occur or in what measure. Moreover, in the counterfactual world in which consumers were not lured to New York & Company stores in order to buy Velocity-branded products, it is not clear that any such ancillary sales would redound to plaintiffs' benefit, especially since there is no evidence that they maintain physical stores where customers could come for a Velocity-branded product and leave with several of plaintiffs' other products. The third supposed intangible loss is based only on Hedvat's uncorroborated and self-serving opinion testimony that his company's products were of a higher quality than defendants' products, and there is no evidence that any

customers who purchased defendants' products were dissuaded from
buying plaintiffs' Velocity-branded products. Thus, while loss of
customer goodwill may weigh in favor of an enhanced award, here
there is insufficient support for the premise that there actually
was a material loss of customer goodwill. Cf. Merck I, 901 F. Supp.
2d at 460 (concluding that a loss of customer loyalty weighed toward
an enhancement, in a case in which the defendant's product was
clearly inferior).

The district court's decision in Merck I, upon which plaintiffs
rely to support their claim that an award of three times profits is
warranted here, presented circumstances bearing on the compensatory
nature of an enhanced profits award -- primarily the fact that the
defendant usurped the plaintiff's market share beyond simply the
infringing goods at issue -- that are not present in this case. In
Merck I, the plaintiff had spent decades and tens of millions of
dollars developing a pure form of an ingredient used in nutritional
supplements, and it was the first company to develop that particular
form. Id. at 446. The defendant falsely advertised that its cheaper
and inferior product was equivalent to the plaintiff's product,
thereby "deliberately and willfully engag[ing] in false advertising
as part of a strategy designed to gain its market share in the
lucrative vitamin and nutritional supplement industry through
deception." Id. at 458. The court concluded that an enhanced award
was needed "to fully compensate [the plaintiff] for the improved
market position [the defendant] enjoyed solely as a result of its

false advertising," since the defendant's deception allowed it to enter the market in which the plaintiff had theretofore been the only participant, and therefore the defendant's "sales in that market even after it corrected its advertising -- and therefore after the window for accounting -- stemmed from its initial deception." Id. at 460.

Here, in contrast, there is no indication that New York & Company gained entry into the activewear market solely because it fooled customers into thinking that it sold clothing produced by plaintiffs. Nor is there any indication, as noted above, that defendants' sale of NY&C Velocity products somehow took away sales from plaintiffs' other products. Thus, the key factor that justified the enhanced award in Merck I on the basis of compensation is not present here.

Plaintiffs also argue that an enhanced award is warranted on the basis of deterrence. As noted above, while the text of the Lanham Act specifies that an enhancement shall not be a "penalty," decisions by the Second Circuit suggest that deterring further infringement is a proper purpose of enhancement. See Merck II, 760 F.3d at 263 ("[I]n light of [the defendant's] demonstrated deceptive and willful conduct -- manifested by its stubborn persistence -- the court's conclusion that enhanced damages were needed to deter [the defendant] from any future willful infringement was not an abuse of discretion."); Getty, 858 F.2d at 113 ("So long as its purpose is to compensate a plaintiff for its actual injuries -- even though the

award is designed to deter wrongful conduct -- the Lanham Act

remains remedial. . . . To the extent that deterrence of willful

infringement is needed, the statutorily provided remedies of § 35

are sufficient: a district court is empowered to enhance a monetary

recovery of damages or profits, or to award plaintiff a full

accounting of an infringer's profits." (citations omitted)); see

also Merck I, 901 F. Supp. 2d at 461 ("[W]hile an award under the

Lanham Act must promote a compensatory and not punitive purpose, it

is no small matter that [the defendant] may be deterred from again

engaging in such brazen behavior by being required to fully account

for its actions." (citing Getty, 858 F.2d at 113)).

Yet plaintiffs have not put forth authority demonstrating that

a court may enhance damages solely for deterrence purposes to an

amount that far exceeds the amount needed to compensate a plaintiff,

and the clear directive of the statute is that an enhancement is to

be compensatory. Thus, because, as discussed above, plaintiffs have

not shown that an award of gross profits is insufficient to

compensate them, deterrence alone, while not irrelevant in assessing

the availability of lost profits as a measure of damages here, does

not on the facts of this case justify enhancing damages to three

times the amount of the stipulated profits. While the infringement

here was willful, it did not rise to the "egregious" conduct at

issue in Merck, and thus a less substantial award is sufficient to

deter defendants here. Merck II, 760 F.3d at 263 ("Other cases that

present less egregious, willful conduct on the part of the

infringing party may not warrant such an enhanced damages award."). The Court therefore concludes that the profits award should not be enhanced beyond the amount of profits to which the parties stipulated at trial, viz., $1,864,337.29.

Defendants, however, have not shown that this award should be further reduced. Defendants concede that they cannot now reduce the profits award by submitting evidence of the costs and expenses used to produce the infringing goods -- i.e., demonstrate their net profits rather than their gross profits from their sales of those goods -- since they failed to do so at trial, but instead simply stipulated to the amount of gross profits. Defs. Mem. 3 n.2; see Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc., 507 Fed. App'x 26, 31 (2d Cir. 2013) (summary order) ("[A] defendant bears the burden to prove any 'deductions' from its gross revenue in calculating profits." (citing Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd., 885 F.2d 1, 7 (2d Cir. 1989)). Nonetheless, defendants argue that the Court must limit the awarded profits to those that accrued after plaintiffs filed this suit, since, they contend, the only evidence of willfulness is that defendants continued to sell the infringing products after being sued. They further argue that, since plaintiffs put on no evidence as to what proportion of the stipulated gross profits accrued after the filing, there is no basis for awarding any profits, and the Court should therefore "eliminate" the award of profits. Defs. Mem. 15.

This argument is hardly persuasive. Defendants provide no authority for the proposition that, where a finding of willfulness is predicated on a defendant's continued infringement after being on notice of the plaintiff's claim, a court may only award those profits that accrued after the notice was received. Cf. Merck II, 760 F.3d at 262 (noting that a court may "award a defendant's *full* profits based solely on deterrence" (emphasis added)). Furthermore, given defendants' willingness to stipulate to an amount of profits at trial, thus obviating the need for plaintiffs to prove defendants' sales of the infringing products, defendants cannot now claim that plaintiffs have not proven sales in the relevant time period, especially because defendants raised no objection when the Court informed the jury that the stipulation of profits relieved the jury of the duty to determine the amount of the award upon a finding of infringement. Tr. 275-76. That defendants seek to eliminate *all* profits awarded because plaintiffs did not establish what share of profits accrued after a certain date further demonstrates the underhandedness of this argument. Accordingly, the Court awards plaintiffs the amount of profits to which the parties stipulated at trial.

The Court turns next to plaintiffs' motion for attorneys' fees and pre- and post-judgment interest. As to fees, Section 35(a) of the Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). The Second Circuit "[has] noted that '[t]he finding of

27

willfulness determines the right to attorneys' fees,' and that
'[e]xceptional circumstances include willful infringement.'" Merck
II, 760 F.3d at 266 (quoting Bambu Sales, Inc. v. Ozak Trading Inc.,
58 F.3d 849, 854 (2d Cir. 1995)). However, it is not the case that a
finding of willfulness requires an award of fees, and courts have
declined to award fees even when they have found willful
infringement. See, e.g., Fresh Del Monte Produce, Inc. v. Del Monte
Foods Co., 933 F. Supp. 2d 655, 665-66 (S.D.N.Y. 2013) (noting that
"[t]he award of attorneys' fees even in an exceptional case is
discretionary," and declining to award fees despite the jury's
finding of willfulness); Lurzer GMBH v. Am. Showcase, Inc., 75 F.
Supp. 2d 98, 102 (S.D.N.Y. 1998) ("Even in a case where, as here,
the defendant engaged in willful deception, a court may decline to
award such fees if there are other, mitigating factors.").

Defendants argue that beyond the finding of willfulness there
is nothing that makes this case exceptional, and therefore the Court
should exercise its discretion not to award fees. Yet courts have
reached different conclusions regarding whether a finding of
willfulness, without more, justifies awarding fees; in other words,
it is not clear whether the default outcome in a case of willful
infringement is to award fees unless there are mitigating factors,
or to require aggravating factors in order to justify a fee award.
See Gidatex, S.r.L. v. Campaniello Imports, Ltd., 82 F. Supp. 2d
136, 147-48 (S.D.N.Y. 2000) (noting that "some courts have awarded

attorneys' fees based solely on a finding of bad faith," while "[o]ther courts have looked to additional factors").

Although defendants note that there is no suggestion that they engaged in the kind of litigation misconduct that often causes courts to award attorneys' fees, see Beastie Boys v. Monster Energy Co., 112 F. Supp. 3d 31, 46 (S.D.N.Y. 2015) (noting that courts "typically award Lanham Act fees based on extreme misconduct during litigation" (emphasis omitted)), they do not point to any of the mitigating factors present in the cases that they cite in which courts have declined to award fees. For example, in Lurzer, this Court identified as "mitigating factors," i.e., factors weighing against an award of fees despite a jury's finding of willful infringement, the absence of evidence that the plaintiff was damaged "from the few, isolated acts of infringement that formed the basis of the jury's award"; "the fact that the case presented a number of close and contested issues as to which the outcome was by no means a foregone conclusion"; and the fact that the case included "endless sparring and protracted litigation by belligerent parties" over "disagreements for which both sides bear blame." 75 F. Supp. 2d at 102-03 (internal quotation marks omitted). Similarly, in Fresh Del Monte Produce, the court declined to award fees where the "case was a close one in several respects, with a verdict that in part favored [the plaintiff] and in part favored [the defendant]." 933 F. Supp. 2d at 665; see also Gidatex, 82 F. Supp. 2d at 148 ("[A] review of

the litigation reveals that each party raised contested issues and
that [plaintiff] did not prevail on every one.").

Here, in contrast, the issue of infringement was not
particularly close, and defendants did not put forth any evidence
indicating that they had a good-faith defense to plaintiffs' claims.
There is no indication that plaintiffs had unclean hands, and it is
not the case that there were only a few isolated instances of
infringement but, rather, nearly $2 million in sales of infringing
products. Therefore the Court concludes that an award of reasonable
attorneys' fees is warranted here, and it instructs plaintiffs to
submit to the Court a calculation of such fees within 14 days, i.e.,
July 17, 2017.

With regard to prejudgment interest, "[a]lthough Section
1117(a) does not provide for prejudgment interest, such an award is
within the discretion of the trial court and is normally reserved
for exceptional cases." Fresh Del Monte Produce, 933 F. Supp. 2d at
666 (quoting Am. Honda Motor Co. v. Two Wheel Corp., 918 F.2d 1060,
1064 (2d Cir. 1990)). For the same reasons discussed above with
regard to the awarding of attorneys' fees, the Court concludes that
this case is an exceptional one for the purpose of granting pre-
judgment interest. Defendants contend that the amount of stipulated
profits is already super-compensatory (since, as noted above, it
does not include deductions), and therefore granting pre-judgment
interest would further overcompensate plaintiffs. See id. at 666
(declining to award pre-judgment interest in part because any harm

30

to plaintiff was compensated by the jury's award). Yet defendants have not demonstrated that the profits award is super-compensatory by at least the amount of the pre-judgment interest to which plaintiffs would otherwise be entitled, and accordingly the vague assertion that plaintiffs have been compensated enough is not persuasive. Pre-judgment interest is therefore warranted. In addition, defendants do not object to awarding plaintiffs post-judgment interest, as the law usually requires. See Defs. Mem. 19-23 (objecting to the awarding of attorneys' fees and pre-judgment interest but not post-judgment interest).

As to the rate of interest, "an award of pre-judgment interest pursuant to § 35(a) [of the Lanham Act] should, as a general matter, compensate plaintiff for what it could have earned if it had had its award when it was first entitled to it." Gillette Co. v. Wilkinson Sword, Inc., No. 89 CV 3586 (KMW), 1992 WL 30938, at *11 (S.D.N.Y. Feb. 3, 1992) (awarding pre-judgment interest at the prime rate). Plaintiffs seek interest at the New York statutory rate of 9%, while defendants contend that interest should be calculated using the prime rate, which defendants represent has ranged from 3.5% to 3.75% since the filing of this suit. In keeping with the compensatory purposes of such an award of interest, the Court determines that interest should be calculated at the prime rate. The plaintiffs are instructed to file a proposed calculation of both pre- and post-judgment interest at the applicable rate, also within 14 days.

In sum, the Court reaffirms its finding that defendants'
infringement was willful and concludes that an award of defendants'
profits is warranted. However, it concludes that an enhancement of
that award is unwarranted, and it hereby amends the Judgment to hold
that defendants are jointly and severally liable to plaintiffs in
the amount of $1,864,337.29. The injunction entered at the time of
the original Judgment remains in place, and this ruling hereby lifts
the stay on the execution of the Judgment. The Court also concludes
that plaintiffs are entitled to reasonable attorneys' fees as well
as pre- and post-judgment interest at the applicable prime rate, and
it instructs plaintiffs to submit proposed calculations of both fees
and interest by July 17, 2017. Any objections thereto must be
submitted by July 24, 2017, after which the Court will issue a final
Amended Judgment reflecting the award of attorneys' fees and
interest.

SO ORDERED.

Dated:   New York, NY
         July 3 , 2017                    JED S. RAKOFF, U.S.D.J.